IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

STEPHEN ROBERT GOODMAN and CHARLES JM. GREER, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

HILLSDALE COLLEGE,

Defendant.

Case No. 1:25-cv-417-HYJ-PJG

Chief Judge: Hala Y. Jarbou
Magistrate Judge: Phillip J. Green

**Oral Argument Requested**

**DEFENDANT HILLSDALE COLLEGE'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS


INTRODUCTION ... 1

STATEMENT OF THE FACTS ... 5

A. Statutory Background ... 5

B. Factual Background ... 6

C. Procedural History ... 7

LEGAL STANDARD ... 10

ARGUMENT ... 11

I. PLAINTIFFS' VPPA CLAIM FAILS THE REQUIREMENTS OF 18 U.S.C. § 2710(B)(1) ... 11

A. Hillsdale College Is Not a "Video Tape Service Provider" ... 11

1. The College's free library of prerecorded lectures is not a "business." ... 12

2. Even if the College's free library of prerecorded lectures were somehow a "business," it is plainly not the focus of the College's work ... 16

B. Plaintiffs Are Not "Renter[s], Purchaser[s], or Subscriber[s]" and Therefore Are Not "Consumers" ... 19

1. To "subscribe" within the meaning of the VPPA, the viewer must pay money or its equivalent, yet, as Plaintiffs admit, the online lectures are free. ... 19

2. Even if a VPPA subscription does not require monetary consideration, it requires a deliberate and durable affiliation with the provider, which Plaintiffs do not plausibly allege. ... 25

C. As the Second Circuit Held in *Solomon* on Materially Identical Facts, What Meta Pixel Allegedly Sent Here Is Not "Personally Identifiable Information" ... 27

D. The College Did Not "Disclose" Any Information To Meta—Plaintiffs Did ... 32

II. EVEN IF HILLSDALE COLLEGE DISCLOSED CONSUMER INFORMATION, DISCLOSURE WAS IN "THE ORDINARY COURSE OF BUSINESS" AND THEREFORE PERMISSIBLE UNDER 18 U.S.C. § 2710(B)(2) ... 36

III. THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE BECAUSE AMENDMENT WOULD BE FUTILE ... 38

CONCLUSION ... 39

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Allinder v. Inter-City Prods. Corp. (USA)*,
152 F.3d 544 (6th Cir. 1998) ... 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 10, 11

*Atl. Recording Corp. v. Project Playlist, Inc.*,
603 F. Supp. 2d 690 (S.D.N.Y. 2009) ... 1, 10

*Austin-Spearman v. AMC Network Ent. LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 2015) ... 3, 25, 26

*Cantu v. Tapestry, Inc.*,
697 F. Supp. 3d 989 (S.D. Cal. 2023) ... 16, 17, 19

*Carroll v. General Mills*,
No. CV 23-1746 DSF (MRWx), 2023 WL 4361093
(C.D. Cal. June 26, 2023) ... 2, 14, 17, 18

*Carroll v. General Mills*,
No. CV 23-1746 DSF (MRWx), 2023 WL 6373868
(C.D. Cal. Sept. 1, 2023) ... 2, 14, 15

*Carter v. Scripps Networks, LLC*,
670 F. Supp. 3d 90 (S.D.N.Y. 2023) ... 25

*Christopherson v. Cinema Ent. Corp.*,
No. 23-CV-3614 (NEB/LIB), 2024 WL 4492021 (D. Minn. Sept. 17, 2024) ... 16

*Comm'r v. Groetzinger*,
480 U.S. 23 (1987) ... 13

*Connors v. Incoal, Inc.*,
995 F.2d 245 (D.C. Cir. 1993) ... 13

*Daniel v. Cantrell,*
375 F.3d 377 (6th Cir. 2004) ... *passim*

*Dubin v. United States*,
599 U.S. 110 (2023) ... 21, 22

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ............ 27, 28, 29, 31

*Erlenbaugh v. United States*,
409 U.S. 239 (1972) ............ 23

*Fischer v. United States*,
603 U.S. 480 (2024) ............ 23

*Global Licensing, Inc. v. Namefind LLC*,
582 F. Supp. 3d 467, 475 (E.D. Mich. 2022) ............ 1, 9

*Hernandez v. Chewy, Inc.*,
No. 2:23-cv-05620 HDV RAO, 2023 WL 9319236 (C.D. Cal. Dec. 13, 2023).... 17, 38

*Hernandez v. Container Store, Inc.*,
No. 2:23-cv-05067-HDV-RAO, 2024 WL 72657
(C.D. Cal. Jan. 3, 2024) ............ 15, 17, 18, 19

*Hernandez v. Jostens, Inc.*,
No. 2:23-cv-05227-HDR-RAW, 2024 WL 1135165 (C.D. Cal. Feb. 7, 2024)..... 17, 38

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) ............ 3, 6, 28, 32

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016)............ *passim*

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F. Supp. 3d 1204 (C.D. Cal. 2017) ............ 12

*Keen v. Helson*,
930 F.3d 799 (6th Cir. 2019) ............ 12

*Lebakken v. WebMD, LLC*,
640 F. Supp. 3d 1335 (N.D. Ga. 2022) ............ 34

*Loc. No. 499, Bd. of Trs. of Shopmen's Pension Plan v. Art Iron, Inc.*,
117 F.4th 923 (6th Cir. 2024) ............ 2, 13, 14, 16

*Memmer v. United Wholesale Mortgage, LLC*,
135 F.4th 398 (6th Cir. 2025) ............ 31

*Miller v. Calhoun Cnty.*,
408 F.3d 803 (6th Cir. 2005) ............ 38

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) .......... *passim*

*Nolen v. PeopleConnect, Inc.*,
No. 20-CV-09203-EMC, 2023 WL 9423286 (N.D. Cal. Dec. 14, 2023) .......... 26

*Osheske v. Silver Cinemas Acquisition Co.*,
132 F.4th 1110 (9th Cir. 2025) .......... 15, 18

*Peterson v. Learfield Commc'ns*,
705 F. Supp. 3d 937 (D. Neb. 2023) .......... 3, 20, 23, 24

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015) .......... 28

*Rodriguez v. ByteDance, Inc.*,
No. 23 CV 4953, 2025 WL 672951 (N.D. Ill. Mar. 3, 2025) .......... 16

*Rodriguez v. Hershey Co.*,
No. 23-cv-398-L-DEB, 2023 WL 6798506 (S.D. Cal. Oct. 12, 2023) .......... 17, 19

*Rodriguez v. JP Boden Servs. Inc.*,
No. 23-cv-00534-L-VET, 2024 WL 559228 (S.D. Cal. Feb. 12, 2024) .......... 25

*Rodriguez v. Sony Comput. Ent. Am., LLC*,
801 F.3d 1045 (9th Cir. 2015) .......... 36, 38

*Salazar v. Paramount Glob.*,
133 F.4th 642 (6th Cir. 2025) .......... *passim*

*Sellers v. Bleacher Rep., Inc.*,
No. 23-CV-00368-SI, 2023 WL 4850180 (N.D. Cal. July 28, 2023) .......... 17

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) .......... *passim*

*Sterk v. Redbox Automated Retail, LLC*,
770 F.3d 618 (7th Cir. 2014) .......... 22, 36

*Tawam v. Feld Ent. Inc.*,
684 F. Supp. 3d 1056 (S.D. Cal. 2023) .......... 16, 17

*The Enter., Inc. v. United States*,
833 F.2d 1216 (6th Cir. 1987) .......... 24

*Tomaszczuk v. Whitaker*,
909 F.3d 159 (6th Cir. 2018) .......... 27

*United States v. Day*,
476 F.2d 562 (6th Cir. 1973) .......... 13

*United States v. Malone*,
889 F.3d 310 (6th Cir. 2018) .......... 22

*United States v. Penn*,
63 F.4th 1305 (11th Cir. 2023) .......... 23

*Wisconsin Cent. Ltd v. United States*,
585 U.S. 274 (2018) .......... 20

**Statutes**

17 U.S.C. § 122 .......... 23

18 U.S.C. § 2710 .......... *passim*

26 U.S.C. § 4252 .......... 23

47 U.S.C. § 153 .......... 23

47 U.S.C. § 228 .......... 23

47 U.S.C. § 522 .......... 23

47 U.S.C. § 552 .......... 23

**Rules**

Fed. R. Civ. P. 12 .......... 10

**Other Authorities**

*About*, Hillsdale College, https://www.hillsdale.edu/about/ .......... 6

*About Online Courses*, Hillsdale College, https://online.hillsdale.edu/about .......... 7, 16

American Heritage Dictionary of the English Language (1st ed. 1969) .......... 20

Anjali C. Das, *Courts Continue to Grapple with VPPA Class Actions*,
Wilson Elser (June 16, 2025), https://www.wilsonelser.com/publications/courts-continue-to-grapple-with-vppa-class-actions .......... 32

Antonin Scalia & Brian Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .......... 23

*Articles of Association*, Hillsdale College (May 17, 1855), https://www.hillsdale.edu/about/history/founding-documents .......... 6

*Classical Liberal Arts Core*, Hillsdale College, https://www.hillsdale.edu/academics/classical-liberal-arts-core .......... 6

*Clubs & Intramurals*, Hillsdale College, https://www.hillsdale.edu/campus-life/clubs-intramurals .......... 7

*College Profile*, Hillsdale College, https://www.hillsdale.edu/about/college-profile/ .......... 6, 7

*Cookies Policy*, Meta (Oct. 5, 2022), https://www.facebook.com/privacy/policies/cookies/version/5567945786592090/ .......... 9, 34

*Current Students*, Hillsdale College, https://www.hillsdale.edu/information-for/current-students .......... 6

*Developing Minds. Improving Hearts.*, Hillsdale College, https://hillsdale.edu .......... 1

Jennifer Dublino, *Best Facebook Marketing Strategies: The Latest Tips*, Business.com (Feb. 19, 2025), https://www.business.com/articles/best-facebook-marketing-strategies .......... 32

Merriam-Webster's Collegiate Dictionary (l0th ed. 1993) .......... 13, 20

*Mission*, Hillsdale College, https://www.hillsdale.edu/about/mission .......... 1

*Privacy Policy*, Meta (June 16, 2025), https://www.facebook.com/privacy/policy .......... 9

Shanti Das, *We didn't click 'consent' on any gambling website. So how did Facebook know where we'd been?*, The Guardian, (Feb. 8, 2025), https://www.theguardian.com/technology/2025/feb/08/we-didnt-click-consent-on-any-gambling-website-so-how-did-facebook-know-where-wed-been .......... 32

*Terms of Service*, Meta (Jan. 1, 2025), https://www.facebook.com/terms .......... 9

The Random House Dictionary of the English Language (2d unabridged ed. 1987) .......... 13, 20

*Video and Library Privacy Protection Act of 1988: Hearing on H.R. 4947 & S. 2361 Before the Subcomm. on Courts, Civil Liberties & the Admin. of Justice of the H. Comm. on the Judiciary & the Subcomm. on Tech. & the Law of the S. Comm. on the Judiciary*, 100th Cong. (1988) ........ 5

Webster's New World College Dictionary (3d ed. 1996) ........ 20

Webster's Third New International Dictionary (1981) ........ 12

*You can help educate America*, Hillsdale College, https://secured.hillsdale.edu/hillsdale/support-online-courses ........ 1

**Acts and Bills**

S. 2361, 100th Cong. (1988) ........ 27

S. Rep. No. 100-599 ........ 5, 36

## INTRODUCTION

Hillsdale College is a small, Christian, classical liberal arts college in southern Michigan. Its students come from all over the United States—and around the world—to "grow in heart and mind by studying timeless truths in a supportive community dedicated to the highest things."[1] Furnishing these students with "a literary, scientific, [and] theological education" is the College's single purpose and sole focus.[2]

In 2011, as a side project, the College opened a free online library of prerecorded lectures organized by course subject matter. This library, like everything that Hillsdale does, is designed to further the College's mission. It does this by setting the College apart from its peers and offering outsiders a glimpse of what its students encounter every day in the classroom. To provide this service, the College relies on the generosity of donors.[3]

Invoking a formerly obscure statute imposing liability on media companies who publicize their customers' private viewing histories, Plaintiffs have sued the College on the theory that its free online library violates the Video Privacy Protection Act

---

[1] *Developing Minds. Improving Hearts.*, Hillsdale College, https://hillsdale.edu, *also available at* https://perma.cc/4TCT-SR8C. "If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings." *Global Licensing, Inc. v. Namefind LLC*, 582 F. Supp. 3d 467, 475 (E.D. Mich. 2022) (citation omitted). The Complaint repeatedly quotes and cites Hillsdale's website, Compl. PageID.2, 11–13, 15, 17, 19–20 ¶¶ 2, 38–39, 44–47, 50–53, 66–67, 79, 105–106, 114–115, and even states that "[a]ll references to online.hillsdale.edu are inclusive of subdomains and related domains," *id.* PageID.2 ¶ 2 n.1. Because the contents of the website are plainly integral to Plaintiffs' claims, the Court here should therefore consider these documents as part of the Complaint. *See, e.g.*, *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694 & n.3 (S.D.N.Y. 2009).

[2] *Mission*, Hillsdale College, https://www.hillsdale.edu/about/mission/, *also available at* https://perma.cc/E8RK-Y4SH.

[3] *You can help educate America*, Hillsdale College, https://secured.hillsdale.edu/hillsdale/support-online-courses, *also available at* https://perma.cc/H5A8-FWY2.

("VPPA" or the "Act"). *See* 18 U.S.C. § 2710. This law generally forbids a "video tape service provider" ("VTSP") from knowingly disclosing to third parties information that "identifies" a renter, purchaser, or subscriber of the VTSP's goods or services as "having requested or obtained specific video materials or services." *Id.* §§ 2710(a), (b)(1). Plaintiffs allege that a computer code commonly known as "Meta Pixel" is embedded on the College's free online library website and that, when they accessed the library to watch lecture videos, the website URLs and their Facebook IDs were sent to Meta Platforms, Inc., which created the Meta Pixel code. Plaintiffs claim that because the Meta Pixel code is embedded in the College's free online library website, the College violated the VPPA.

Plaintiffs' claims are meritless for several reasons. In the first place, the College is not a video tape service provider. It is not in the audiovisual-material "business," because it does not rent, sell, or deliver "audio visual material" as a good or service for income or profit. 18 U.S.C. § 2710(a)(4); *see Loc. No. 499, Bd. of Trs. of Shopmen's Pension Plan v. Art Iron, Inc.*, 117 F.4th 923, 930–31 (6th Cir. 2024). Quite the contrary: the College's online library is entirely free, and to the extent that the College (a non-profit charitable organization) offers *any* good or service as a "business" (it does not), its focus is its four-year, in-person, bachelor's degree program, not free online videos. *See, e.g.*, *Carroll v. General Mills ("General Mills I")*, No. CV 23-1746 DSF (MRWx), 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023), *see also Carroll v. General Mills ("General Mills II")*, No. CV 23-1746 DSF (MRWx), 2023 WL 6373868, at *3 (C.D. Cal. Sept. 1, 2023) (dismissing second amended complaint).

Second, and regardless, Plaintiffs are not "subscribers." Under the VPPA, "subscriber" means a person who makes payments to access audiovisual materials for a defined period. *See, e.g.*, *Peterson v. Learfield Commc'ns, LLC*, 705 F. Supp. 3d 937, 956 (D. Neb. 2023), *appeal dismissed*, No. 23-3773, 2024 WL 3199574 (8th Cir. Mar. 28, 2024). Plaintiffs, by contrast, gained indefinite access to videos after creating a free account, which requires submitting merely names and email addresses, making them more like patrons of an online library than subscribers to a commercial service. Anyway, even if a "subscriber" need not have paid to have a VPPA claim, what Plaintiffs allege is a far cry from the "deliberate and durable affiliation with the provider" required. *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015).

Next, under the correct reasoning of a recent Second Circuit decision rendered on materially identical facts, the information that Plaintiffs allege was sent to Meta is not personally identifiable information ("PII"). PII is "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior," *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 49 (2d Cir. 2025) (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016)), meaning it disclosed "1) a consumer's identity; 2) the identity of 'specific video materials'; and 3) the fact that the person identified 'requested or obtained' that material." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) (quoting 18 U.S.C. § 2710(a)(3)). The majority of the federal courts of appeals that have addressed the issue have held that "static digital identifiers," such as the Facebook IDs alleged to

have been disclosed here, are not PII. *See In re Nickelodeon Consumer Privacy Lit.*, 827 F.3d at 283. Indeed, in *Solomon*, the Second Circuit specifically held that the information transmitted *by Meta Pixel* is not PII. *Solomon,* 136 F.4th at 54–55. Plaintiffs regurgitate the same points about Meta Pixel argued in *Solomon*, and they fail here for the same reasons.

Fourth, the College did not disclose Plaintiffs' information to Meta, because to the extent any disclosures occurred, *Plaintiffs* made the disclosures—not the College. A VTSP is not liable under the Act for disclosures made by consumers, even if it facilitated the disclosures or could have designed its business or product differently to prevent the disclosures. *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066–67 (9th Cir. 2015). Plaintiffs allege that when they interacted with the College's library website, *their own computers* sent information directly to Meta. Plaintiffs never allege (and cannot truthfully allege) that the College even accessed—let alone disclosed—their Facebook IDs. Hence it could not have violated the VPPA.

Finally, even if the College knowingly disclosed Plaintiffs' PII, its disclosures were permissible because Hillsdale made the alleged disclosures to support its own marketing efforts, which fall within the "ordinary course of business" exception to the VPPA. *Daniel v. Cantrell,* 375 F.3d 377, 382 (6th Cir. 2004).

Because these pleading defects are purely legal and cannot be fixed by amendment, the Complaint should be dismissed with prejudice.

## STATEMENT OF THE FACTS

### A. Statutory Background

The VPPA "was enacted in 1988 in response to the Washington City Paper's publication of then-Supreme Court nominee Robert Bork's video rental history."[4] Acting "swiftly" to prevent further disclosures,[5] Congress proposed new legislation, the "Video *and Library* Privacy Protection Act," which "would have punished both disclosures relating to video tape service providers and disclosures relating to library borrowing records."[6] But the Senate Judiciary Committee "was unable to resolve questions regarding the application of [the library] provision[s] for law enforcement," so it eliminated the library provisions, leaving only the provisions covering video tape service providers.[7] The amended act passed.

Under the VPPA, "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person." 18 U.S.C. § 2710(b)(1). A "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). A "consumer" is "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1).

---

[4] *Netflix*, 795 F.3d at 1065.

[5] *Id.*

[6] *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 285 (emphasis added) (citing the *Video and Library Privacy Protection Act of 1988: Hearing on H.R. 4947 & S. 2361 Before the Subcomm. on Courts, Civil Liberties & the Admin. of Justice of the H. Comm. on the Judiciary & the Subcomm. on Tech. & the Law of the S. Comm. on the Judiciary*, 100th Cong. 13–15 (1988)).

[7] S. Rep. No. 100-599, at 8 (1988).

"[P]ersonally identifiable information" denotes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3); *see also In re Hulu*, 86 F. Supp. 3d at 1095. The VPPA's general ban on disclosure comes with many exceptions and conditions.

**B. Factual Background**

Hillsdale College, founded in 1844, is a small, Christian school whose "educational mission rests upon two principles: academic excellence and institutional independence."[8] The College comprises around 1,500 undergraduate students from 50 states and 16 countries, studying under around 170 professors, on a nearly 400-acre campus located in rural southern Michigan.[9] It was founded in gratitude "to God for the inestimable blessings resulting from the prevalence of civil and religious liberty and intelligent piety in the land" and in the belief "that the diffusion of sound learning is essential to the perpetuity of these blessings."[10]

The College's in-person campus life is indispensable to its academic mission. As it explains, "[t]he conversations and tight-knit community" students experience on campus are necessary for learning.[11] The College fosters this sense of community by

[8] *About*, Hillsdale College, https://www.hillsdale.edu/about/, *also available at* https://perma.cc/GGD7-FRGJ.

[9] *About*, Hillsdale College, https://www.hillsdale.edu/about/, *also available at* https://perma.cc/GGD7-FRGJ; *College Profile*, Hillsdale College, https://www.hillsdale.edu/about/college-profile/, *also available at* https://perma.cc/YCD9-X5SR.

[10] *Articles of Association*, Hillsdale College (May 17, 1855), https://www.hillsdale.edu/about/history/founding-documents/, *also available at* https://perma.cc/KP56-GE74.

[11] *Current Students*, Hillsdale College, https://www.hillsdale.edu/information-for/current-students/, *also available at* https://perma.cc/4G9X-4S34; *Classical Liberal Arts Core*, Hillsdale College, https://www.hillsdale.edu/academics/classical-liberal-arts-core/, *also available at* https://perma.cc/5VZS-2FZJ.

enrolling students in a two-year structured core of courses, and its small student body means there is one professor for every eight students with an average class size of 14 students.[12] Beyond the classroom, the College stresses that "student life is an integral part of [the] liberal arts experience" because co-curricular activities provide "the opportunity to pursue good living by building friendships, exercising leadership, and practicing excellence in all areas of life outside the classroom."[13]

In 2011, the College launched its free online courses website to offer viewers an opportunity to watch prerecorded lectures.[14] The College provides this small online library of educational materials to the public entirely for free.[15] And "to underwrite the costs of developing, producing, and distributing these courses," the College relies solely on private donations.[16] Thus any person who "register[s]" for a free "online.hillsdale.edu account"—merely by providing a name and email address—can "access Hillsdale College online courses and track [her] learning progress" without paying a penny.[17]

### C. Procedural History

According to the Complaint, Plaintiffs Stephen Robert Goodman and Charles JM. Greer each visited the College's free online library in 2023 and 2024, registered for a

[12] *College Profile*, Hillsdale College, https://www.hillsdale.edu/about/college-profile/, *also available at* https://perma.cc/YCD9-X5SR.

[13] *Clubs & Intramurals*, Hillsdale College, https://www.hillsdale.edu/campus-life/clubs-intramurals/, *also available at* https://perma.cc/U36E-4YPM.

[14] *About Online Courses*, Hillsdale College, https://online.hillsdale.edu/about, *also available at* https://perma.cc/8A9N-KYY8.

[15] *Id.*; Compl. PageID.2, 12 ¶¶ 2, 44–47.

[16] Compl. PageID.12 ¶ 47.

[17] Compl. PageID.13 ¶¶ 51–53.

free "online.hillsdale.edu account," and "request[ed], obtain[ed], and/or view[ed] video classes." Compl. PageID.19–20 ¶¶ 105–06, 114–15. Plaintiffs then sued the College under the VPPA, alleging that the College "knowingly disclos[ed] the personally identifiable information of viewers of its online classes." Compl. PageID.2 ¶ 1. Plaintiffs allege that when they "requested, obtained, and or viewed those video classes[,] [their] Personal Viewing Information was disclosed to Meta and other third-parties." Compl. PageID.19–20 ¶¶ 107, 116.

To explain how the disclosures happened, Plaintiffs allege that the College "knowingly" maintains a piece of code called the Meta Pixel on its online library website. Compl. PageID.13 ¶ 54. They allege that when Meta Pixel is embedded in a website and "a user exchanges information with the host of that site—such as through a search query or video selection" (that is, when a person clicks a link on the website), the user's computer runs "Meta's software script" (the Meta Pixel code), which "directs the user's browser to send a separate message to Meta's servers" (that is, the user's computer sends information stored on the user's computer directly to Meta). Compl. PageID.8 ¶ 26. Put differently, when a user interacts with the College's online library website, such as by clicking a link, the user's computer allegedly transmits to Meta information stored on the user's computer, including a jumbled version of the website's URL. Compl. PageID.8, 15 ¶¶ 26, 66, 68.

Plaintiffs allege that these transmissions contained their "Personal Viewing Information," Compl. PageID.19–20 ¶¶ 107, 116, in the form of computer code, such as this:

> https://www.facebook.com/privacy_sandbox/pixel/register/trigger/?id=711322226445334&ev=PageView&dl=https%3A%2F%2Fonline.hillsdale.edu%2Fcourses%2Fpromo%2Ftotalitarian-novels&rl=&if=false&ts=1740630825595&sw=1920&sh=1080&v=2.9.184&r=stable&a=tmSimo-GTM-WebTemplate&ec=3&o=12318&fbp=fb.1.1738956026667.341932906172499229 &cs_est=true&ler=empty&cdl=API_unavailable&it=1740630705273&coo=false&tm=1&rqm=FGET

Compl. PageID.15 ¶ 66. They allege that this alphanumeric text contained a "video url and title." Compl. PageID.15 ¶¶ 66–67. Plaintiffs allege that the "same [Meta Pixel] code also transmits to Meta a c_user cookie" in another paragraph of code. Compl. PageID.15 ¶ 69. Plaintiffs allege that the c_user cookie contains, in part, the user's "Facebook ID" ("FID"), which is "a unique sequence of numbers linked to that individual's Facebook profile," if the user is logged into Facebook in the same browser. Compl. PageID.9, 15–16 ¶¶ 28, 69, 72. If the user is logged out of Facebook, or logged into Facebook in a different browser, however, his browser sends a message containing "an encrypted" FID not linked to his Facebook profile. Compl. PageID.16–17 ¶¶ 72–74. To have an FID, Plaintiffs must have a Facebook account and consent to Facebook's Privacy Policy and Cookie Policy, which disclose Meta's use of Meta Pixel and cookies on third-party websites.[18] Compl. PageID.9 ¶ 28.

[18] *Cookies Policy*, Meta (Oct. 5, 2022), https://www.facebook.com/privacy/policies/cookies/version/5567945786592090/, *also available at* https://perma.cc/6M55-KWA4; *Terms of Service*, Meta (Jan. 1, 2025), https://www.facebook.com/terms, *also available at* https://perma.cc/BZS4-D44V; *Privacy Policy*, Meta (June 16, 2025), https://www.facebook.com/privacy/policy/, *also available at* https://perma.cc/XR9G-Q3H5. Again, "[i]f referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings." *Global Licensing*, 582 F. Supp. 3d at 475 (citation omitted). The Complaint repeatedly quotes and cites Facebook's website, Compl.

Plaintiffs do not allege that the College discloses—or even has access to—the user's FID. *See generally* Compl. PageID.15–17 ¶¶ 64–87. They allege that "at all relevant times," they each "had a personal Facebook page and a personal FID." Compl. PageID.19–20 ¶¶ 103, 112. And when they "requested, obtained, and or viewed th[e] video classes" on the College's website, which contains Meta Pixel, their website visit triggered the Meta Pixel code and thus "disclosed" their "Personal Viewing Information . . . to Meta" in the form of (1) the jumbled website URL in one transmission and (2) the c_user cookie, which sometimes contains a user's FID, in another transmission. Compl. PageID.15, 19–20 ¶¶ 66–69, 107, 116.

Plaintiffs seek to certify a class of "[a]ll persons in the United States who visited online.hillsdale.edu (including subdomains), viewed at least one video during the time that [the Meta Pixel was] active at that website, and have or have ever had an FID." Compl. PageID.20–21 ¶ 120. The class would also necessarily include the above persons whose Facebook page "contained [ ] personal information, including [the individual's] name." Compl. PageID.19–20 ¶¶104, 113.

## LEGAL STANDARD

A complaint must "contain sufficient factual matter" "to state a claim to relief that is plausible on its face" in order "[t]o survive a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see* Fed. R. Civ. P. 12(b)(6). "A claim has facial plausibility

PageID.5–10, ¶¶ 21–24, 26–30, 32, 34–36 n.4–23, and specifically links to Meta's Cookies Policy. Compl. PageID.8 ¶ 27 n.15. The contents of Facebook's website are again plainly integral to Plaintiffs' claims, so the Court should also consider these documents as part of the Complaint. *See Atl. Recording Corp.*, 603 F. Supp. 2d at 694 & n.3.

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft,* 556 U.S. at 678. "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint must be dismissed. *Id.* at 679.

## ARGUMENT

The Complaint should be dismissed with prejudice because Plaintiffs do not and cannot plausibly allege that (1) the College is "a regulated entity (a 'video tape service provider')," (2) Plaintiffs are "protected part[ies] (the [College's] 'consumer[s]')," and (3) the College "engaged in prohibited conduct (knowingly disclosing [Plaintiffs'] 'personally identifiable information' to a third party)." *Salazar v. Paramount Glob.*, 133 F.4th 642, 649 (6th Cir. 2025).

### I. PLAINTIFFS' VPPA CLAIM FAILS THE REQUIREMENTS OF 18 U.S.C. § 2710(B)(1)

#### A. Hillsdale College Is Not a "Video Tape Service Provider"

The Act imposes liability on only "video tape service providers." A VTSP is a "person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual

materials." 18 U.S.C. § 2710(a)(4).[19] This definition has two elements. *First*, the defendant's renting, selling, or delivering of audiovisual content must qualify as a "business." *Second*, this "business" must be a focus of the defendant's work, not merely peripheral or incidental to the defendant's primary activity. Because Plaintiffs do not (and cannot) plausibly allege that the College's free online library of lectures constitutes a "business," much less that it is a focus of the College's work, their claim fails at the threshold.

**1. The College's free library of prerecorded lectures is not a "business."**

For VPPA liability to attach, a defendant's alleged "rental, sale, or delivery" of audiovisual content must constitute "business." Because the Act does not define this word, its ordinary meaning governs. *See Keen v. Helson*, 930 F.3d 799, 802 (6th Cir. 2019); *see also Salazar*, 133 F.4th at 650 (plain-meaning interpretation of VPPA). "When used in this context, 'business' connotes" not only "'a particular field of endeavor,' *i.e.*, a focus of the defendant's work," *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (quoting Webster's Third New International Dictionary 302 (1981) (def. 1d)), but specifically one involving "commercial or industrial enterprise" for the purpose of financial gain, *Business*, Webster's Third New International Dictionary 302 (1981) (def. 1b). Dictionaries are uniform on this point: "business," in this context, consists in "the purchase and sale

[19] The second definition of a VTSP is irrelevant here. *Contrast Daniel*, 375 F.3d at 382 ("Daniel does not allege that the defendants in question are engaged in the business of rental, sale or delivery of prerecorded video cassette tapes. Therefore, the defendants may only be VTSPs if personal information was disclosed to them under subparagraph (D) or (E) of subsection (b)(2).").

of goods in an attempt to make a profit." *Business*, The Random House Dictionary of the English Language 282 (2d unabridged ed. 1987); *see also id.* ("a person, partnership, or corporation engaged in commerce, manufacturing, or a service; profit-seeking enterprise or concern"); *Business,* Merriam-Webster's Collegiate Dictionary 154 (l0th ed. 1993) ("commercial or mercantile activity engaged in as a means of livelihood").

Following the Supreme Court's lead, the Sixth Circuit has accorded "business" precisely the same meaning when analyzing its use in other statutes: namely, that to "be *engaged* in a . . . business" means that one is "involved in the activity with continuity and regularity and [the person]'s primary purpose for engaging in the activity [is] for income or profit." *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987) (construing tax code); *Loc. No. 499*, 117 F.4th at 930–31 (extending *Groetzinger* to another federal statute); *see also United States v. Day*, 476 F.2d 562, 567 (6th Cir. 1973) (holding that "engage in the business of" in 18 U.S.C. § 922(a) requires "the purpose of livelihood or profit"). And while *Groetzinger* "confined" its interpretation to the tax law at issue, 480 U.S. at 27 n.8, courts around the country—including the Sixth Circuit—continue to "rely on it" in other statutory contexts, since it is "the most authoritative pronouncement available" on the term's meaning. *Connors v. Incoal, Inc.*, 995 F.2d 245, 251 (D.C. Cir. 1993) (applying *Groetzinger* to ERISA statute 29 U.S.C. § 1301(b)(1)); *see Loc. No. 499*, 117 F.4th at 930–31 (agreeing). Hence, citing *Groetzinger*, endorsing *Connors*, and collecting several supporting dictionary entries, the Sixth Circuit explained just last year that "[o]ne thread connecting" common

definitions of "business" is "one's intent to profit from his enterprise," while "[a]nother . . . is that one 'carries on' the activity as a . . . 'profession.'" *Loc. No. 499*, 117 F.4th at 930 (also analyzing definitions of "trade").

Applying this plain and well-established meaning of "business" to VPPA cases is straightforward, as *Carroll v. General Mills* shows. *General Mills I*, 2023 WL 4361093, at *3. There, the plaintiffs alleged that the cereal giant and related entities run a "for-profit business" that, in addition to selling food, promotes a "mobile application" that allows users to watch baking videos, as the plaintiffs did, and then shares viewers' private information with Facebook and Google. *Id.* at *1. Yet the court held the theory meritless, in large part because the "[p]laintiffs fail[ed] to allege even the first prong of a section 2710(b)(1) claim . . . that [the d]efendants are video tape service providers." *Id.* at *3. General Mills, after all, "is 'a company manufacturing and selling cereals, yogurts, cake mixes, dog food, and other products' and it is not engaged in the business of delivering audiovisual material." *Id.* (quoting General Mills' motion to dismiss). To be sure, the plaintiffs tried their best to "re-cast General Mills as [a] video tape service provider," by "add[ing] links to various other videos on the General Mills' websites," alleging "that the production quality is high," "that General Mills incurred significant expense in designing its website to host this video content," and that the websites were "critical marketing" efforts. *See General Mills II*, 2023 WL 6373868, at *3. But, as the court explained, "[n]one of this indicates that the videos are profitable in and of themselves and that they are the business that General Mills is engaged in." *Id.* And while "General Mills may be getting money from

website visits," the plaintiffs did not "plead that it is profiting from video views themselves." *Id.* In all, because the complaint "failed to adequately allege that General Mills is a video tape service provider whose particular field of endeavor is audiovisual material," it failed to state a VPPA claim. *Id.*; *see also Hernandez v. Container Store, Inc.*, No. 2:23-cv-05067-HDV-RAO, 2024 WL 72657, at *2 (C.D. Cal. Jan. 3, 2024) (dismissing because no "allegations that Defendant sells [the video content] or even receives remuneration from TikTok").

The Complaint here fails for the same reasons. Hillsdale College does not qualify as a VTSP because, as alleged, it does not provide audiovisual material as a good or service to consumers for profit—or even revenue. If the College has any "business," it is in-person education, which plainly is not a "transaction involving an exchange of video materials." *Osheske v. Silver Cinemas Acquisition Co.*, 132 F.4th 1110, 1113 (9th Cir. 2025).[20] And while the College's online lectures' "production quality" is indeed "high," reflecting "significant expense in designing its website to host this video content," and while the websites are allegedly "critical" to the College's outreach efforts, "[n]one of this indicates that the videos are profitable in and of themselves and that they are the business that" the College "is engaged in." *General Mills II*, 2023 WL 6373868, at *3. It is likewise irrelevant that the College "may be getting money from website visits," since Plaintiffs do not and cannot "plead that it is profiting" from the concededly free "video views themselves." *Id.*; *compare id.*, *with*

[20] It is therefore unsurprising that, according to the College's research, no court has ever held an in-person educational institution to be a VTSP.

Compl. PageID.12–13, 23 ¶¶ 50–53, 132. The whole point of the library is to make important educational content freely available to "all who wish to learn."[21]

In sum, since the College as alleged is plainly not "inten[ding] to profit from [t]his enterprise" and is not carrying on the activity of posting free online talks as a "profession," the alleged conduct is not a "business" in the first place. *Loc. No. 499*, 117 F.4th at 930.

**2. Even if the College's free library of prerecorded lectures were somehow a "business," it is plainly not the focus of the College's work.**

"In recognition that the dictionary definition of the term 'business' connotes 'a particular field of endeavor,'" district courts around the country (and especially in California, a hotbed of VPPA litigation) "have required that the delivery of video content be 'a focus of the defendant's work'" such that "the defendant's product or service" is "substantially involved in the conveyance of video content and significantly tailored to serve that purpose." *Tawam v. Feld Ent. Inc.*, 684 F. Supp. 3d 1056, 1060 (S.D. Cal. 2023) (citation omitted); *Cantu v. Tapestry, Inc.*, 697 F. Supp. 3d 989, 993 (S.D. Cal. 2023) (citation omitted); *see also, e.g.*, *Rodriguez v. ByteDance, Inc.*, No. 23 CV 4953, 2025 WL 672951, at *7 (N.D. Ill. Mar. 3, 2025); *Christopherson v. Cinema Ent. Corp.*, No. 23-CV-3614 (NEB/LIB), 2024 WL 4492021, at *5–6 (D. Minn. Sept. 17, 2024). This principle perfectly complements the Sixth Circuit's recent holding that the VPPA "tethers" the concept of the VTSP's "delivery of prerecorded . . . audio visual

[21] *About Online Courses*, Hillsdale College, https://online.hillsdale.edu/about, *also available at* https://perma.cc/8A9N-KYY8.

materials" to the "goods or services" that the VTSP provides to the consumer. *Salazar*, 133 F.4th at 650. Hence, consistent with *Salazar*'s logic, videos are *not* the focus of a defendant's business if they merely "market [the d]efendant's goods" and "are not themselves the goods on offer." *Container Store*, 2024 WL 72657, at *2.

In other words, it is "recognized consistently that delivering video content must be central to the defendant's business or product for the VPPA to apply." *Id.* Courts use other synonyms, too. *E.g.*, *Hernandez v. Chewy, Inc.*, No. 2:23-cv-05620 HDV RAO, 2023 WL 9319236, at *3 (C.D. Cal. Dec. 13, 2023) ("integral to"); *General Mills I*, 2023 WL 4361093, at *4 ("tailored"). Activities "ancillary to Defendant's true business purposes" are, by definition, not a "focus." *Rodriguez v. Hershey Co.*, No. 23-cv-398-L-DEB, 2023 WL 6798506, at *2 (S.D. Cal. Oct. 12, 2023); *Hernandez v. Jostens, Inc.*, No. 2:23-cv-05227-HDR-RAW, 2024 WL 1135165, at *2 (C.D. Cal. Feb. 7, 2024) (same); *contrast Sellers v. Bleacher Rep., Inc.*, No. 23-CV-00368-SI, 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023) (declining to dismiss given "factual questions about the degree to which Bleacher Report's business model is tailored to delivery of audio visual materials").

For example, a company that sells designer handbags, shoes, and jewelry—and so is engaged in "business" generally—is not a VTSP even if it hosts marketing videos for those goods on their websites, because the focus of its work is not providing audiovisual materials but selling luxury goods. *Cantu*, 697 F. Supp. 3d at 994. Likewise, a business that organizes monster-truck rallies is not a VTSP even when it posts videos on its website to promote the rallies. *Tawam*, 684 F. Supp. 3d at 1061.

And a corporation "that operates retail stores and an e-commerce website selling container products and associated goods" does not, by virtue of its online marketing, become "engaged in the business" of delivering video content—*notwithstanding* allegations that "[h]osting and monetizing video content is a key part of Defendant's business model" because it "uses the videos as a 'trojan horse' to collect and disclose viewers' PII so it can later retarget them for advertisements." *Container Store, Inc.*, 2024 WL 72657, at *2.

This case falls comfortably within the *Container Store* line of cases. "In Plaintiff[s'] own words, the videos are aimed toward the sale of Defendant's products," bookstore merchandise (Compl. PageID.12 ¶ 45) and distance-learning programs (Compl. PageID.12 ¶ 46), and "are a marketing tool to promote Defendant's" reputation, by soliciting donations—"nothing more." *Container Store, Inc.*, 2024 WL 72657, at *2. So, "[e]ven by Plaintiffs' characterization, the websites are maintained for the brands"; "they are not Defendant's particular field of endeavor." *General Mills I*, 2023 WL 4361093, at *4. Put differently, the alleged downstream revenue-generating activities are irrelevant because Plaintiffs did not purchase anything from, or participate in, these programs. *Osheske*, 132 F.4th at 1113 (noting that there must be "a *transaction* involving an exchange of video materials that qualifies as a 'rental, sale, or delivery'") (emphasis added). Nor do Plaintiffs allege that the websites for these separate goods and services, such as bookstore merchandise and distance-learning programs, contained videos or used Meta Pixel. And even if Plaintiffs had purchased these separate items, they would not transform the College itself or the

College's free online library into an audiovisual business—and even less so than purchasing a handbag from a for-profit company and viewing its online marketing videos transforms it into an audiovisual business. *See Cantu*, 697 F. Supp. 3d at 994. At most, the videos are "ancillary to Defendant's true business purposes." *Hershey Co.*, 2023 WL 6798506, at *2. Because they are not central to the College's mission of educating the hearts and minds of its on-campus students, the VPPA simply does not apply. *Container Store*, 2024 WL 72657, at *2. The alleged conduct of "[h]osting and creating prerecorded videos" is simply not enough to move the needle. *Cantu*, 697 F. Supp. 3d at 993.

For this second independent reason, Plaintiffs do not and cannot plausibly allege that the College is a VTSP.

### B. Plaintiffs Are Not "Renter[s], Purchaser[s], or Subscriber[s]" and Therefore Are Not "Consumers"

The VPPA protects only "consumer[s]," 18 U.S.C. § 2710(b)(1), which it defines as "any renter, purchaser, or subscriber of goods or services from a video tape service provider," *id.* § 2710(a)(1). Plaintiffs assert that they are "subscribers to [Hillsdale College]'s services" and therefore qualify as consumers "of its video content." Compl. PageID.23 ¶ 134. But, for two reasons, this theory lacks merit.

#### 1. To "subscribe" within the meaning of the VPPA, the viewer must pay money or its equivalent, yet, as Plaintiffs admit, the online lectures are free.

A "subscriber," in this context, denotes a person who has entered into a commercial relationship involving the delivery of video content. Specifically, as Judge

Buescher's scholarly opinion in *Peterson v. Learfield Communications* explains, it contemplates the exchange of monetary consideration or its equivalent:

> Black's Law Dictionary defines "subscribe," in relevant part, as "To agree to take and pay for something, esp[ecially] something regularly delivered; esp[ecially], to pay money, usu[ally] annually, to receive a weekly or monthly service, such as a newspaper or magazine." Black's Law Dictionary 1727 (11th ed. 2019). Editions of Black's Law Dictionary more contemporaneous to the passage of the VPPA similarly include some kind of payment within the meaning of "subscribe." Black's Law Dictionary 1596 (4th ed. 1968) (defining "subscribe," in relevant part, as "to agree in writing to furnish money or its equivalent"); Black's Law Dictionary 1427 (6th ed. 1990) (same).

705 F. Supp. 3d at 956. These definitions are especially probative because of the "fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018) (cleaned up). Several other definitions from contemporaneous dictionaries are in accord.[22]

[22] *Subscribe*, Webster's New World College Dictionary 1334 (3d ed. 1996) (defining "subscriber" as a person who "agree[s] to receive and pay for a . . . service [from a provider] for a specified period of time" or agreeing to "receive and pay for . . . theater tickets . . . for a specified period of time"); *Subscription*, Merriam-Webster's Collegiate Dictionary 1172 (10th ed. 1993) (defining "subscription" as an "arrange[ment]" to "receiv[e] or mak[e] use of something of a continuing or periodic nature on a pre-payment plan"); *Subscribe*, Webster's New World College Dictionary 1334 (3d ed. 1996) (a subscriber is one who "agree[s] to receive and pay for a periodical, service, theater tickets, etc. for a specified period of time"); *Subscribe*, American Heritage Dictionary of the English Language 1282 24 (1st ed. 1969) (defining "subscribe" to mean, among other things, (1) to "sign (one's name)," (2) to "affix one's signature to a document as a witness or to show consent," (3) to "express concurrence or approval," (4) to "promise to pay or contribute money," or (5) to "contract to receive and pay for a certain number of issues of a newspaper or periodical"); *see also* The Random House Dictionary of the English Language 1896 (2d unabridged ed. 1987) (defining "subscriber" as "a person . . . (1) 'that subscribes, as to a publication or concert series,' (2) 'that pays a monthly charge to be connected to a television cable service,' or (3) that promises to donate a sum of money" and "subscription" as, among other things, (1) "a sum of money given or pledge" and (2) "the right to receive a periodical for a sum paid, usually for an agreed number of issues").

Statutory context confirms that a "subscriber" makes payments to access audiovisual materials for a defined period. *See Salazar*, 133 F.4th at 649–50 (stressing importance of interpreting words in VPPA in context—specifically, "consumer," which includes subscribers). To begin with, the VPPA does not use the term "subscriber" in isolation but instead in a grouping of three terms—"renter, purchaser, [and] subscriber"—that together define "consumer," 18 U.S.C. § 2710(a)(1), so these terms must be parsed together. Two interpretive canons are particularly useful here. Under the *noscitur a sociis* canon, "a word is known by the company it keeps." *Dubin v. United States*, 599 U.S. 110, 124 (2023). Applying this principle, courts identify the "common feature" in a set of terms and then discern how the terms "capture various [distinct] aspects" of that common concept. *Id.* at 126. This canon "is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Id.* at 124–25. Courts also rely on the *ejusdem generis* canon when faced with a potentially broad term at the end of a list of terms, "constru[ing] the general words in a manner that limits them to the same class of things enumerated by the preceding specific words." *Allinder v. Inter-City Prods. Corp. (USA)*, 152 F.3d 544, 549 (6th Cir. 1998).

Application of the canons here yields the conclusion that the terms "renter, purchaser, [and] subscriber" capture three different ways to pay for access to videos: one can (1) rent a video (pay for temporary access); (2) purchase a video (pay for permanent access); or (3) make recurring payments for periodic delivery of videos or time-limited access to a catalog of videos. *See, e.g.*, *Netflix*, 795 F.3d at 1064 ("a Netflix

subscriber" can "order DVDs for home delivery," the number "[d]epending on the terms of subscription," or "stream videos instantly over the Internet, or both"); *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 621 (7th Cir. 2014) ("customers rent DVDs and Blu-ray discs with a debit or credit card for a daily rental fee"). Put differently, the "common feature" that links these three terms, *Dubin*, 599 U.S. at 126, is payment for access to audiovisual materials.

On this reading, each form of payment has independent significance, with unique benefits and drawbacks. *See United States v. Malone*, 889 F.3d 310, 312 (6th Cir. 2018) (heeding "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant"). "Renting" is typically cheaper than purchasing or subscribing but provides only temporary access to a limited set of material. "Purchasing" gives permanent access to material but is typically more expensive. And "subscribing" is typically somewhere in between, allowing temporary access at a consistent cost to a broader range of material, which may evolve over time. But the common feature is that all three terms involve the act of exchanging money or its equivalent for access to audiovisual materials. So, while in the contemporary lexicon, the term "subscriber" in isolation might not always require payment (though it did at the time the VPPA was enacted, *see supra* at 20 n.22), the "specific items preceding" it here—renter and purchaser—always require payment, and that common thread between the three terms informs the meaning of "subscriber" here.

*See Fischer v. United States*, 603 U.S. 480, 490 (2024) (citing Antonin Scalia & Brian Garner, *Reading Law: The Interpretation of Legal Texts* 208 (2012)).

This understanding of "subscriber" as one engaged in a paid, commercial transaction is also consistent with how the term is interpreted across federal laws regulating businesses that provide audiovisual materials. *See Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("[A] legislative body generally uses a particular word with a consistent meaning in a given context"); *United States v. Penn*, 63 F.4th 1305, 1313 (11th Cir. 2023) ("[courts] prefer to read terms consistently across multiple statutes on the same subject"); *compare Peterson*, 705 F. Supp. 3d at 956 (lamenting failure of parties to "refer the Court to [circuit] or Supreme Court precedent bearing on what it means to be a 'subscriber'"). In the context of satellite television broadcasting, for example, a "subscriber" is "a person or entity that receives a secondary transmission service from a satellite carrier and *pays* a fee for the service . . . ." 17 U.S.C. § 122(j)(6) (emphasis added). Likewise, federal law defines subscribers as those who pay for cable-television or phone services. *See, e.g.*, 47 U.S.C. § 522(13) (defining "multichannel video programming distributor" as one "who makes available for *purchase*, by subscribers or customers, multiple channels of video programming" (emphasis added)); 47 U.S.C. § 552(c) (rules for "notice of service and rate changes to subscribers"); 26 U.S.C. § 4252(b) (defining "toll telephone service" as "a service which entitles the subscriber, upon *payment* of a periodic charge . . . to the privilege of an unlimited number of telephonic communications . . . ." (emphasis added)); *see also* 47 U.S.C. § 228(c)(4); 47 U.S.C. § 153(55). Similarly, a key provision

of federal postal law provided preferred rates to publications with a "legitimate list of subscribers"—"legitimate" being determined by whether the people on the list actually paid for the publications. *See The Enter., Inc. v. United States*, 833 F.2d 1216, 1222 (6th Cir. 1987).

Plaintiffs do not and cannot plausibly allege that they fit within this definition. The website confirms that all they needed to do to gain indefinite access to Hillsdale's full online library of prerecorded lectures is provide a first name, last name, and email address. This "mere exchange of personal information . . . do[es] not suffice to make [either] Plaintiff a 'subscriber,'" as neither "provided monetary consideration or its equivalent in exchange" for video access. *Peterson*, 705 F. Supp. 3d at 960. Not only is such information not remotely the "equivalent of monetary consideration in 1988," but also "the VPPA statute itself appears to minimize the importance of 'disclosure . . . solely of the names and addresses of consumers.'" *Id.* (citing 18 U.S.C. § 2710(b)(2)(D)).

Indeed, "[e]ven if merely exchanging personal information *could* constitute an equivalent to the monetary consideration required to form a 'subscription,'" Plaintiffs have "not alleged facts indicating that is the case here." *Id.* at 961 (emphasis in original). They "do[ ] not explain how giving [their] personal contact information" to the College "benefitted [it] in any way to constitute consideration." *Id.* They do not claim, "for example, that [the College] ever used [their] personal contact information to solicit donations or advertise merchandise"—only that the College *could have* done so. *Id.* For this reason, too, the claim lacks merit.

**2. Even if a VPPA subscription does not require monetary consideration, it requires a deliberate and durable affiliation with the provider, which Plaintiffs do not plausibly allege.**

Other courts, while stopping short of *Peterson*'s monetary-consideration requirement, nonetheless "require some sort of ongoing relationship between provider and subscriber." *Austin-Spearman*, 98 F. Supp. 3d at 669; *see Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90, 98 (S.D.N.Y. 2023) (a "broad interpretation of 'subscriber' has support only if the definition of a 'consumer' is read in isolation"); *Rodriguez v. JP Boden Servs. Inc.*, No. 23-cv-00534-L-VET, 2024 WL 559228, at *4 (S.D. Cal. Feb. 12, 2024) (requiring "subscriber" be considered in conjunction with "'goods and services' of a 'video tape service provider'").

What these cases teach, in particular, is that subscribers must engage in some sort of "deliberate and durable affiliation with the provider." *Austin-Spearman*, 98 F. Supp. 3d at 669. And, critically, they recognize that a viewer who can decide never to "visit the website ever again—and that decision will have zero consequences, costs, or further obligations"—is a mere "user," not a subscriber. *Id.* ("Such casual consumption of web content, without any attempt to affiliate with or connect to the provider, exhibits none of the critical characteristics of 'subscription.'").

Plaintiffs here do not qualify as subscribers under this definition either. They allege only that they created a "free account" to access "online courses" from the College's free online library, and that they watched free videos. Compl. PageID.12, 13, 19, 20 ¶¶ 44, 53, 106, 115. They add that "Hillsdale, via its online.hillsdale.edu website, offers prerecorded video materials," and that if a person "register[s] for an

online.hillsdale.edu account," they receive unlimited "access [to] the majority of those videos." Compl. PageID.12–13 ¶¶ 50–51 (alleging that the other videos are available without an account). But unlimited, free access to something is not a subscription. A person who creates an account to access a website might qualify as a "registered user," rather than simply a website "visitor," but that does not make her a subscriber. *See Nolen v. PeopleConnect, Inc.*, No. 20-CV-09203-EMC, 2023 WL 9423286, at *2 (N.D. Cal. Dec. 14, 2023). And, indeed, Plaintiffs seek to represent viewers who did even less: "All persons in the United States who visited online.hillsdale.edu (including subdomains), viewed at least one video during the time that Trackers were active at that website, and have or have ever had an FID." Compl. PageID.20–21 ¶ 120. Regardless, it is obvious that both the Plaintiffs and the putative class members could choose never to "visit the website ever again" and "that decision [would] have zero consequences, costs, or further obligations." *Austin-Spearman*, 98 F. Supp. 3d at 669. In sum, because Plaintiffs' "casual consumption of" the College's free online lectures "exhibits none of the critical characteristics of 'subscription,'" it does "not suffice to render" them subscribers within the meaning of the Act. *Id.*

At most, Plaintiffs were mere "patrons" of the College's free online library, and legislative history confirms that the Act categorically does not apply to such users. *See Salazar*, 133 F.4th at 651 n.9 (addressing VPPA legislative history); *Daniel*, 375 F.3d at 383 (same). Indeed, not only were libraries included alongside VTSPs in the original draft of the VPPA before those provisions were cut, *see supra* Statutory Background, but the draft law also distinguished between "patrons" of libraries and

paying "consumers" of VTSPs. "Patron" was defined more broadly than "consumer" to mean "any individual who *requests or receives* (A) services within a library; or (B) books or other materials on loan from a library." S. 2361, 100th Cong. § 2 (1988). When Congress uses different words within the same statute, those words "have different meanings," *Tomaszczuk v. Whitaker*, 909 F.3d 159, 166 (6th Cir. 2018), so the fact that the draft law distinguished between "receiving" free library materials and "subscribing" to a commercial service further confirms that "subscribing" requires payment.

Because Plaintiffs are patrons of a free online library, they are not "subscribers" to an audiovisual-material business, and thus the VPPA does not apply to them.

### C. As the Second Circuit Held in *Solomon* on Materially Identical Facts, What Meta Pixel Allegedly Sent Here Is Not "Personally Identifiable Information"

The VPPA generally prohibits video tape service providers from "knowingly disclos[ing]" consumers' "personally identifiable information." 18 U.S.C. § 2710(b)(1). The VPPA defines PII to "include[ ] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3).

The term "identifiable" means "information that is 'capable of' identifying *a person*, as well as information that, standing alone, identifies *a person*." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984 (9th Cir. 2017) (emphasis added); *see Solomon*, 136 F.4th at 51. By contrast, information that simply identifies a personal device or some other personal characteristic—but not a person—is not PII. *Eichenberger*, 876 F.3d

at 984; *In re Nickelodeon Consumer Privacy Lit.*, 827 F.3d at 283; *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 183 (S.D.N.Y. 2015). The information must also reveal that a person watched specific audiovisual materials and connect that person to the specific materials viewed. *In re Nickelodeon*, 827 F.3d at 283; *Eichenberger*, 876 F.3d at 984; *Solomon*, 136 F.4th at 53; *In re Hulu*, 86 F. Supp. 3d at 1095.

As the majority of circuits hold, to determine what information qualifies as PII, the VPPA looks at whether the information is of the kind "that would readily permit an *ordinary person* to identify a specific individual's video-watching behavior." *Solomon*, 136 F.4th at 49 (emphasis added) (quoting *In re Nickelodeon*, 827 F.3d at 267); *see also Eichenberger*, 876 F.3d at 985. This test turns on the nature of the information itself, separate from the identity or any special knowledge of the recipient. *Solomon*, 136 F.4th at 52. It asks whether what is disclosed by the VTSP is the kind of information that would generally enable an "ordinary person" to identify the consumer, his video-watching history, and the connection between them. *Id.*; *In re Hulu*, 86 F. Supp. 3d at 1095–96. If an "ordinary person" would not understand that the consumer, his video-watching history, and the connection between them were disclosed, *Solomon*, 136 F.4th at 52, the VTSP is not liable under the VPPA—*even if* a "technologically sophisticated third party" could use the information to identify the consumer, his video-watching history, and the connection between them. *Id.*

Courts applying the "ordinary person" test to the code disclosed by Meta Pixel—including the Second Circuit, in the recent *Solomon* case—have held that this code

(including the FID and a jumbled version of the name of the video watched) is not PII and does not convey video-viewing history to an ordinary person. *Solomon*, 136 F.4th at 55. *Solomon* holds that even though the words of a video title can be contained, in some sense, in the jumble of code transmitted by Meta Pixel, "[t]he words of the title . . . are interspersed with many characters, numbers, and letters. It is implausible that an ordinary person would look at the phrase . . . and understand it to be a video title." *Id.* at 54. Similarly, while Meta Pixel may transmit an FID in certain circumstances, the "sequence of numbers . . . is not labeled, [and] the FID would be just one phrase embedded in many other lines of code," so it is not plausible that an ordinary person would even realize that an FID was being transmitted—let alone what the FID is or how it can be connected to a person. *Id.*

More, even if the transmissions through Meta Pixel were reasonably comprehensible such that an ordinary person could figure out that part of the code contained an FID, an FID is simply a static numerical identifier, so it is not PII. *Id.* The Third Circuit has held that "static digital identifiers," like IP addresses and "digital code[s] in a cookie file," are not PII even if a recipient could collect or had collected enough information to link those digital identifiers to real people. *In re Nickelodeon*, 827 F.3d at 283. The Ninth Circuit also similarly has held that a "Roku device serial number" is not PII even though it was disclosed to Adobe and Adobe was able to link the serial number to a specific person. *Eichenberger*, 876 F.3d at 986.

Just like the allegations in *Solomon*, which are materially indistinguishable, the allegations here do not plausibly allege a disclosure of Plaintiffs' PII. Here, as in

*Solomon*, Plaintiffs allege that when they accessed the page in question, Meta received a jumbled version of the website title and an FID that was stored on Plaintiffs' browsers. *See Solomon*, 136 F.4th at 54. Yet here, as in *Solomon*, "[i]t is implausible that an ordinary person would look at the phrase 'title% 22% 3A% 22-% E2% 96% B7% 20The% 20Roast% 20of% - 20Ric% 20Flair' . . . and understand it to be a video title." *Id.* What is more, the c_user cookie contains an FID that can be linked to the individual's Facebook profile only *if the user is logged into Facebook in the same browser* at the time she accesses the site with the Meta Pixel, and that user's Facebook profile can be linked to the individual only if it publicly displays her real name. Compl. PageID.9, 15–16 ¶¶28, 69, 72. So the code may or may not even contain an FID, let alone one that can be linked to a person's name, because not every person is logged into Facebook or logged in while using the same browser as when they visit the site. Thus, even if an "ordinary person" could on some occasion link the jumbled website title to an FID (which, to be clear, Plaintiffs do not allege ever occurs, because they allege the information is disclosed *only* to Meta), on many occasions there will not be an FID to link to at all. Hence the College did not disclose PII.

Although Plaintiffs likely will urge this Court to split from the "ordinary person" test in general and *Solomon* in particular, doing so would be a mistake. As *Solomon* correctly notes, the VPPA "views disclosure from the perspective of the disclosing party," and analyzing what an ordinary person could do with the disclosed information appropriately keeps the focus on the disclosing party, the consumer, and the nature of the disclosed information, rather than on the skills, knowledge, or other

information of the recipient. 136 F.4th at 52 (quoting *Eichenberger*, 876 F.3d at 985). The "ordinary person" test also "better informs video service providers of their obligations under the VPPA." *Eichenberger*, 876 F.3d at 985. In fact, Congress amended the VPPA in 2013 but "declined to amend the definition of personally identifiable information" to encompass digital identifiers, "even in the face of testimony asking for an expansion of the definition to include IP addresses." *Solomon,* 136 F.4th at 53; *see In re Nickelodeon*, 827 F.3d at 288; *see also Memmer v. United Wholesale Mortg., LLC*, 135 F.4th 398, 416 (6th Cir. 2025) (Thapar, J., dissenting) ("Legislative history can never override the statute's text, but it can illuminate the 'context' in which the statute was passed." (citation omitted)). As the overwhelming majority of federal courts of appeals to confront this issue have held, "the VPPA was not intended to create liability where a third party is able to 'assemble otherwise anonymous pieces of data to unmask the identity of individual users.'" *Solomon*, 136 F.4th at 54 (quoting *In re Nickelodeon*, 827 F.3d at 290); *see also Eichenberger*, 876 F.3d at 985. "It does not make sense that a video tape service provider's liability would turn on circumstances outside of its control and the level of sophistication of the third party." *Id.* at 52.

More, holding that the code transmitted by Meta Pixel is PII would expand the VPPA's breadth far beyond what Congress intended. Dozens, if not hundreds, of cases

are currently before district courts claiming that Meta Pixel discloses PII.[23] Countless websites use Meta Pixel.[24] Allowing VPPA claims to proceed against every website with videos that use Meta Pixel goes far beyond the statute's original intent, which was merely to prohibit a neighborhood brick-and-mortar videotape store from providing a reporter with a list of videos a person had rented. *See In re Hulu*, 86 F. Supp. 3d at 1096 (discussing Judge Bork case). It would also bury the district courts in meritless VPPA litigation.

### D. The College Did Not "Disclose" Any Information To Meta—Plaintiffs Did

The VPPA prohibits one specific act: the *VTSP defendant's* "knowing[] disclos[ure]" of consumers' PII. 18 U.S.C. § 2710(b)(1); *Salazar*, 133 F.4th at 648-49. If, instead, someone else discloses PII to a third party—even if a VTSP allegedly facilitated the disclosure—the VTSP is not liable.

*Netflix* is instructive. The plaintiffs there sued Netflix for alleged VPPA violations on the ground that when they connected their accounts to their televisions, this disclosed their PII, against their wishes, to others watching the same television, such

---

[23] An estimated 250 VPPA class actions were filed against companies in 2024—nearly double of those filed in 2023. *See* Anjali C. Das, *Courts Continue to Grapple with VPPA Class Actions*, Wilson Elser Publications (June 16, 2025), https://www.wilsonelser.com/publications/courts-continue-to-grapple-with-vppa-class-actions, *also available at* https://perma.cc/5BTT-V2L4.

[24] *See* Jennifer Dublino, *Best Facebook Marketing Strategies: The Latest Tips*, Business.com (Feb. 19, 2025), https://www.business.com/articles/best-facebook-marketing-strategies/, *also available at* https://perma.cc/8KK4-72GR (explaining how businesses can use the Meta Pixel to target past visitors with dynamic advertisements on Facebook); Shanti Das, *We didn't click 'consent' on any gambling website. So how did Facebook know where we'd been?*, The Guardian, (Feb. 8, 2025), https://www.theguardian.com/technology/2025/feb/08/we-didnt-click-consent-on-any-gambling-website-so-how-did-facebook-know-where-wed-been, *also available at* https://perma.cc/JV5Z-UA8K (explaining a third of the 150 websites Guardian staff visited had the Meta Pixel installed).

as friends and family members. 795 F.3d at 1063–65. They alleged that by designing the system this way Netflix unlawfully disclosed their PII to third parties. *Id.* at 1065. But the Ninth Circuit rejected the argument that the VPPA "required [Netflix] to transmit information in a reasonably secure manner or undertake certain technical fixes to prevent incidental disclosures to third parties." *Id.* at 1067. Instead, the court held that Netflix could not be held liable for designing its application in a way that facilitated the disclosure of the subscribers' PII, since it was ultimately the subscribers—not Netflix—that took the action that triggered the disclosure. *Id.* at 1066–67. In other words, a company cannot be held liable for disclosures to third parties that "the subscriber may independently permit." *Id.*

The same logic absolves the College. Plaintiffs allege that when they visit the College's free online library, the Meta Pixel causes their FID to be sent directly from their computer to Meta—without ever being accessed or possessed by the College. Compl. PageID.8 ¶ 26. Plaintiffs allege that they have FIDs because, self-evidently, they have Facebook accounts. *See* Compl. PageID.8 ¶ 27. When signing up for their Facebook accounts, Plaintiffs agreed to Facebook's Privacy Policy and Cookie Policy, which, among other things, specifically inform users that Meta:

> may place cookies on your computer or device and receive information stored in cookies when you use or visit . . . [w]ebsites and apps provided by other companies that use the Meta Products, including companies that incorporate Meta technologies into their websites and apps. Meta uses cookies and receives information when you visit those sites and

> apps, including device information and information about your activity, without any further action from you.[25]

Meta discloses that it "use[s] cookies if you have a Facebook account, use the Meta Products, including our website and apps, or visit other websites and apps that use the Meta Products," such as Meta Pixel.[26]

On these facts, the College cannot be liable because it is *Plaintiffs*, not the College, who knowingly disclosed their FIDs to Meta. Importantly, Plaintiffs never allege (and cannot truthfully allege) that the College even accesses Plaintiffs' FIDs. And if the College cannot even access Plaintiffs' FIDs, it cannot disclose them. *See Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1342 (N.D. Ga. 2022) (disclosure of PII under the VPPA requires "conscious transmission of private information").

Specifically, Plaintiffs allege only that Meta Pixel is a computer "code" that is "embedded" on the College's free online library website. Compl. PageID.6–8, 13 ¶¶ 23, 26, 54. They say that when they visit the library website and "click[ ] on a video," they "activ[ate] a code 'trigger'" (*i.e.*, the Meta Pixel code) that causes their computer to "disclose [certain] information to Meta" in the form of additional computer code. Compl. PageID.15 ¶ 66. They allege that this code "transmits" the "c_user cookie" stored on their browser that contains their FID, but they do not allege that the College has access to or discloses their FID. Compl. PageID.15–16 ¶ 69. Rather, because they created Facebook accounts and allowed Meta to use cookies, the Meta Pixel code

---

[25] *Cookies Policy*, Meta (Oct. 5, 2022), https://www.facebook.com/privacy/policies/cookies/version/5567945786592090/, *also available at* https://perma.cc/6M55-KWA4 (cited at Compl. PageID.8 ¶ 27 n.15).

[26] *Id.*

facilitates transmissions directly from their computers back to Meta. Compl. PageID.15 ¶ 66.

They also allege that the code sometimes separately contains a video title in the form of a jumbled URL. Compl. PageID.15 ¶ 66.[27] They allege that the Meta Pixel "directs the user's browser to send a *separate* message to Meta's servers" with this code. Compl. PageID.8 ¶ 26 (emphasis added). Taking Plaintiffs' allegations as true, the College does not disclose PII. Any disclosures are made by the users to Meta, directly from their computers.

To be sure, Plaintiffs' allegations support an inference that the College could *prevent* users from disclosing their FIDs to Meta by removing the Meta Pixel from its website. But that is neither here nor there. The Act does not require the College to "undertake certain technical fixes to prevent incidental disclosures to third parties." *Netflix*, 795 F.3d at 1067. Just as the plaintiffs in *Netflix* disclosed their own data to third parties, Plaintiffs here sent PII to Meta by engaging with the website and the embedded Meta Pixel. If anything, the facts here are *even worse* for Plaintiffs than the facts in *Netflix* were for the plaintiffs there, since Netflix at least had the plaintiffs' PII and disclosed it to them (lawfully) on their accounts. Here the College disclosed nothing, because it never received Plaintiffs' PII.

[27] For example, https://www.facebook.com/privacy_sandbox/pixel/register/trigger/?id=711322226445334&ev=PageView&dl=https%3A%2F%2Fonline.hillsdale.edu%2Fcourses%2Fpromo%2Ftotalitarian-novels&rl=&if=false&ts=1740630825595&sw=1920&sh=1080&v=2.9.184&r=stable&a=tmSimo-GTM-WebTemplate&ec=3&o=12318&fbp=fb.1.1738956026667.341932906172499229&cs_est=true&ler=empty&cdl=API_unavailable&it=1740630705273&coo=false&tm=1&rqm=FGET, which Plaintiffs allege includes a "video url and title." Compl. PageID.15 ¶ 66.

## II. EVEN IF HILLSDALE COLLEGE DISCLOSED CONSUMER INFORMATION, DISCLOSURE WAS IN "THE ORDINARY COURSE OF BUSINESS" AND THEREFORE PERMISSIBLE UNDER 18 U.S.C. § 2710(B)(2)

The VPPA permits any disclosure that is "incident to the ordinary course of business" of the VTSP. 18 U.S.C. § 2710(b)(2)(E). The statute limits "ordinary course of business" to mean "debt collection activities, order fulfillment, request processing, and the transfer of ownership." *Id.* § 2710(a)(2). In other words, VTSPs may disclose PII to third parties that support or enable the VTSP to operate its business.

The Sixth Circuit held in *Daniel* that the terms "order fulfillment" and "request processing," *see* 17 U.S.C. § 2710(a)(2), permit "the use, by VTSPs, of 'mailing houses, warehouses, computer services, and similar companies for marketing to their customers.'" 375 F.3d at 382 (quoting S. Rep. No. 100–599 at 14 (1988)). This provision reflects "the unremarkable fact that no business is an island and that video tape services providers, like many other businesses, 'may use third parties in their business operations . . . .'" *Rodriguez v. Sony Comput. Ent. Am., LLC*, 801 F.3d 1045, 1054 (9th Cir. 2015) (quoting *Sterk*, 770 F.3d at 624). So, for example, a VTSP may provide a third-party marketing agency with PII to enable the agency to create a marketing campaign. *See Daniel*, 375 F.3d at 382. The VPPA does not require VTSPs to conduct all business activities in-house, rather than work with third parties that specialize in critical business operations such as "mailing," "storage," "computer services," and "marketing." *Id.*; *Sterk*, 770 F.3d at 625 (disclosure of *all* consumers' *complete* video rental histories to third party company handling customer service

requests did not violate VPPA because it was made in the "ordinary course of business").

The VPPA distinguishes disclosures to facilitate a VTSP's own marketing efforts, which fall within the "ordinary course of business" exception, 18 U.S.C. § 2710(b)(2)(E), from disclosures to third parties for their own marketing (or other) purposes, *id.* § 2710(b)(2)(D). The statute permits both types of disclosure, but the latter allowance is more limited: the VTSP must permit the customer to opt out, *id.* § 2710(b)(2)(D)(i), and can disclose only "names and addresses," though it may also disclose the "subject matter of any video tapes or other audio visual material" when "the disclosure is for the exclusive use of marketing goods and services directly to the consumer" by a third party, *id.* § 2710(b)(2)(D)(ii). These restrictions do not apply when a VTSP discloses information to third parties for its own marketing efforts.

Here, Plaintiffs allege that the College discloses information to Meta to facilitate the College's own marketing efforts. Compl. PageID.11–12 ¶¶ 39, 41–43. Specifically, Plaintiffs allege that the College "is a sophisticated user of Meta and other online advertisement platforms who employs professional staff to manage them. It uses those advertisements to promote classes at online.hillsdale.edu, its distance learning program, the college itself, and to augment sales and donations." Compl. PageID.11 ¶ 39. They allege that "social media 'plays a huge part' in how [Hillsdale College] reaches users for the college's 'important mission' to spread the ideas taught in its classes," and that "Hillsdale's professional marketing staff [has] explained that 'Facebook ads are particularly helpful in enrolling new students in Hillsdale's online

courses and in helping people to get to know about the college.'" Compl. PageID.11–12 ¶¶ 41–43. In Plaintiffs' telling, then, the College has integrated Meta, a third party, into its "business operations," *Sony Comput. Ent. Am., LLC*, 801 F.3d at 1054, and discloses information to Meta as part of its marketing efforts. Thus, because the College allegedly discloses information to Meta for its own marketing, those disclosures are permitted under the "ordinary course of business" exception. *See Daniel*, 375 F.3d at 382.

### III. THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE BECAUSE AMENDMENT WOULD BE FUTILE

Like the VPPA pleading in *Salazar*, the Complaint here suffers from legal defects that cannot be fixed. *See* 133 F.4th at 653 (affirming dismissal of plaintiff's original complaint with prejudice). Because amending the Complaint would be futile, the Complaint should be dismissed with prejudice. *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 (6th Cir. 2005).

Plaintiffs cannot overcome the Act's requirements. For starters, they cannot allege facts that would make the College's free online library, whose website is already incorporated by reference, a video tape service provider. Nor can they allege facts supporting an inference that they were VPPA "consumers." *See Chewy, Inc.*, 2023 WL 9319236, at *4 (dismissing original complaint with prejudice for failure to allege VTSP status); *Jostens, Inc.*, 2024 WL 1135165, at *2 (dismissing first amended complaint).

Plaintiffs also cannot allege that the College disclosed PII to Meta. "[S]tatic digital identifiers," such as the FID, are inexorably not PII. *In re Nickelodeon Consumer Privacy Lit.*, 827 F.3d at 283. And the Second Circuit held that the Meta Pixel is not PII. *Solomon,* 136 F.4th at 54–55. These barriers cannot be overcome by amending—they are stubborn facts about the Meta Pixel.

Finally, Plaintiffs cannot allege that the disclosures were permissible within the ordinary course of business. The College allegedly made the disclosure to support its own marketing efforts, which falls within the "ordinary course of business" exception to the VPPA. *See Daniel*, 375 F.3d at 382.

## CONCLUSION

This Court should dismiss Plaintiffs' Complaint with prejudice.

Dated: June 30, 2025

Respectfully submitted,

*s/ Ryan J. Walsh*
Ryan J. Walsh
EIMER STAHL LLP
10 East Doty Street, Suite 621
Madison, WI 53703
(608) 620-8346
(312) 692-1718 (fax)
rwalsh@eimerstahl.com

Collin Vierra
EIMER STAHL LLP
1999 South Bascom Avenue
Suite 1025
Campbell, CA 95008
(408) 889-1668
(312) 692-1718 (fax)
cvierra@eimerstahl.com

*Counsel for Defendant*
*Hillsdale College*