IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

---

STEPHEN ROBERT GOODMAN and
CHARLES JM. GREER, individually
and on behalf of all others similarly
situated,

    *Plaintiffs,*

    v.

HILLSDALE COLLEGE,

    *Defendant.*

Case No. 1:25-cv-417-HYJ-PJG

Chief Judge: Hala Y. Jarbou
Magistrate Judge: Phillip J. Green

**Oral Argument Requested**

---

**DEFENDANT HILLSDALE COLLEGE'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT FOR
FAILURE TO STATE A CLAIM UPON WHICH
RELIEF CAN BE GRANTED**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 2

  I.  PLAINTIFFS' VPPA CLAIM FAILS THE REQUIREMENTS OF 18 U.S.C. § 2710(B)(1) ............................................................................................ 2

    A.  Hillsdale College Is Not a "Video Tape Service Provider" .......................... 2

    B.  Plaintiffs Are Not "Subscriber[s]" Because They Did Not Pay For Access and Lack a Durable Relationship with the College......................... 6

    C.  As the Second Circuit Held in *Solomon* on Identical Facts, Meta Pixel Does Not Transmit "Personally Identifiable Information" ......................... 9

    D.  The College Did Not "Disclose" Any Information to Meta—Plaintiffs Did ........................................................................................................ 15

  II.  EVEN IF THE COLLEGE DISCLOSED CONSUMER INFORMATION, IT WAS IN "THE ORDINARY COURSE OF BUSINESS" AND PERMITTED BY 18 U.S.C. § 2710(B)(2) ......................................................................................... 18

  III.  THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE BECAUSE AMENDMENT WOULD BE FUTILE .................................................................. 19

CONCLUSION ................................................................................................ 19

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................. 5

*Atl. Diving Supply, Inc. v. Basnight,*
  No. 2:22-CV-298, 2022 WL 5568083 (E.D. Va. Sept. 21, 2022) ...................... 16, 17

*Austin-Spearman v. AMC Network Ent. LLC,*
  98 F. Supp. 3d 662 (S.D.N.Y. 2015) ................................................ 8, 9

*Buechler v. Gannett Co., Inc.,*
  No. CV 22-1464-CFC, 2023 WL 6389447 (D. Del. Oct. 2, 2023) ...................... 16

*Carroll v. General Mills, Inc.,*
  No. CV 23-1746 DSF (MRWx), 2023 WL 4361093 (C.D. Cal. June 26, 2023) ......... 5

*Carroll v. General Mills, Inc.,*
  No. CV 23-1746 DSF (MRWx), 2023 WL 6373868 (C.D. Cal. Sept. 1, 2023) ......... 2

*Chutich v. Green Tree Acceptance, Inc.,*
  No. 3-88-CIV 869, 1993 WL 173813 (D. Minn. Apr. 19, 1993) .......................... 16

*Czarionka v. Epoch Times Ass'n, Inc.,*
  No. 22 CIV. 6348 (AKH), 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) ............... 17

*Daniel v. Cantrell,*
  375 F.3d 377 (6th Cir. 2004) ....................................................... 2, 18

*Eichenberger v. ESPN,*
  876 F.3d 979 (9th Cir. 2017) ...................................................... 12, 16

*Ellis v. Cartoon Network, Inc.,*
  803 F.3d 1251 (11th Cir. 2015) ...................................................... 7, 9

*Fed. Nat'l Mortg. Ass'n v. River Houze, LLC,*
  596 F. Supp. 3d 925 (E.D. Mich. 2022) ............................................. 8, 10

*Feliciano v. Dep't of Transp.,*
  145 S. Ct. 1284 (2025) ............................................................... 7

*Freed v. Thomas,*
  976 F.3d 729 (6th Cir. 2020) ......................................................... 18

*Golden v. NBCUniversal Media, LLC,*
  688 F. Supp. 3d 150 (S.D.N.Y. 2023) ................................................ 17

*Gustafson v. Alloyd Co.,*
  513 U.S. 561 (1995) ................................................................... 6

*Haines v. Cengage Learning, Inc.,*
  No. 1:24-CV-710, 2025 WL 2045644 (S.D. Ohio July 22, 2025) ...................... 11, 12

*Hernandez v. Container Store, Inc.*,
No. 2:23-CV-05067-HDV-RAO, 2024 WL 72657 (C.D. Cal. Jan. 3, 2024) .............. 5

*Hughes v. NFL*,
No. 24-2656, 2025 WL 1720295 (2d Cir. June 20, 2025) ......................................... 1

*Johnson v. United States*,
559 U.S. 133 (2010) ................................................................................................ 7

*Krassick v. Archaeological Inst. of Am.*,
No. 2:21-CV-180, 2022 WL 2071730 (W.D. Mich. June 9, 2022) ............................ 3

*Manza v. Pesi, Inc.*,
No. 24-CV-690-JDP, 2025 WL 1445762 (W.D. Wis. May 20, 2025).................. 3, 11

*Nolen v. PeopleConnect, Inc.*,
No. 20-CV-09203-EMC, 2023 WL 9423286 (N.D. Cal. Dec. 14, 2023).................... 8

*Peterson v. Learfield Commc'ns*,
705 F. Supp. 3d 937 (D. Neb. 2023) ........................................................................ 6

*Pileggi v. Washington Newspaper Publ'g Co., LLC*,
— F.4th —, 2025 WL 2319550 (D.C. Cir. Aug. 12, 2025) ............................. 1, 4, 11

*Rodriguez v. Sony Comput. Ent. Am., LLC*,
801 F.3d 1045 (9th Cir. 2015) ............................................................................... 18

*Salazar v. NBA*,
118 F.4th 533 (2d Cir. 2024) ............................................................................... 7, 8

*Salazar v. Paramount Glob.*,
133 F.4th 642 (6th Cir. 2025)....................................................................... *passim*

*Shapiro v. Peacock TV*,
No. 23-CV-6345 (KMK), 2025 WL 968519 (S.D.N.Y. Mar. 31, 2025) ................... 15

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) ........................................................................ 9, 10, 15

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ......................................................................... 7, 8, 11

**Statutes**

18 U.S.C. § 2710............................................................................................................ 18

47 U.S.C. § 551(c)(1) ....................................................................................................... 7

# INTRODUCTION

Plaintiffs distort the Video Privacy Protection Act beyond recognition. In their telling, any entity that "distribut[es] video content" is automatically in the "business" of doing so, any user who creates a free account is a "consumer," and nearly every website violates the Act simply by using commonplace tools like Meta Pixel—even if, as here, the defendant never possessed the information that the tool supposedly "disclosed." That is not the law. If it were, the VPPA would "sweep in all websites." *Pileggi v. Washington Newspaper Publ'g Co.*, LLC, — F.4th —, 2025 WL 2319550, at *14 (D.C. Cir. Aug. 12) (Randolph, J., concurring). The Act must be "construed against" such "expansive liability." *Id.* at *9 (opinion of court). Each word must be read in context, not "giv[en]…the broadest possible meaning." *Salazar v. Paramount Glob.*, 133 F.4th 642, 650 (6th Cir. 2025) ("*Paramount*").

Plaintiffs' effort to impose crippling liability on a small college because it hosts a free online course library fails. First, because the College receives no revenue from the library, the VPPA does not apply. Plaintiffs' strawman—that nonprofits are "businesses" when they sell services for profit—misses the point: the alleged "business" here is free. Next, Plaintiffs sidestep the College's textual showing that being a "subscriber" must involve payment and durable affiliation. Unlimited, costless access is not that. Third, Plaintiffs have no answer for the Second Circuit's *Solomon* decision, which "effectively shut the door for Pixel-based VPPA claims." *Hughes v. NFL*, 2025 WL 1720295, at *2 (2d Cir. June 20) (summary order). Fourth, confronted with their own (undeniable) allegation that the College never possessed

- 1 -

any PII and so could not have disclosed it, Plaintiffs respond that disclosure should nevertheless be "attributed" to the College—a concession that the College itself disclosed nothing. Finally, Plaintiffs incorrectly dismiss the marketing exception recognized in *Daniel v. Cantrell*, 375 F.3d 377 (6th Cir. 2004), as dictum. It, too, bars liability.

## ARGUMENT

### I. PLAINTIFFS' VPPA CLAIM FAILS THE REQUIREMENTS OF 18 U.S.C. § 2710(B)(1)

For four reasons, the College cannot be held liable under the Act for operating a free online library of educational courses.

#### A. Hillsdale College Is Not a "Video Tape Service Provider"

**1.** Contemporaneous dictionaries and cases agree that "business" connotes "commercial or mercantile activity engaged in as a means of livelihood" or profit. Opening.Br. PageID.58–59 (citation omitted). Hence, although General Mills is a business, its making available a "mobile application" featuring baking videos is not "*engage[ment] in the business* of delivering audiovisual material,*" since although the clips are high-end, effective marketing tools, nothing "indicates that the videos are profitable in and of themselves and that they are the business that General Mills is engaged in." *Carroll v. General Mills, Inc.*, 2023 WL 6373868, at *1, 3 (C.D. Cal. Sept. 1). Likewise, even if the nonprofit College somehow qualifies as a "business" generally, Plaintiffs cannot plausibly allege that "the videos are profitable in and of themselves and that they are the business that" the College "is engaged in." *Id.*; *see also* Opening.Br. PageID.60–62 (citing additional cases).

- 2 -

Rather than engage with this argument, Plaintiffs train their fire on a position the College has *not* taken: that "nonprofit organizations" are universally exempt from the VPPA because they "are not businesses." Opp. PageID.144. Remarkably, their attack on this strawman spans nearly four pages. PageID.142–45. The College instead contends that the *activity* at issue here—hosting a free online library—is not "business" activity because it is not the provision of "audiovisual material as a good or service to consumers" for profit, revenue, or livelihood. Opening.Br. PageID.58, 61.

Plaintiffs rely heavily on *Krassick v. Archaeological Institute of America*, 2022 WL 2071730 (W.D. Mich. June 9), but that case cuts against them. Interpreting a Michigan privacy law, *Krassick* holds that undertaking an activity for "pecuniary benefit" is engaging in business, and so even nonprofits engage in business when they "sell merchandise or other items of value to support their operations." *Id.* at *8. But, under that logic, the College is *not* engaged in business here, since it provides access to its online library for *free*, reaping no "pecuniary benefit" from users. *See* Opening.Br. PageID.61. Likewise, in Plaintiffs' second case, *Manza v. Pesi, Inc.*, 2025 WL 1445762 (W.D. Wis. May 20), the court held that the defendant was engaged in business, despite its nonprofit status, because it "regularly s[old] videos on its website." *Id.* at *2.

Plaintiffs retort that the free online library drives book sales and donations and promotes separate "paid distance learning programs," PageID.146, but those are distinct sources of revenue *separate* from the online library. *See* Compl. PageID.12. Just as in *General Mills*, even if the College uses free audio-visual material to

promote other products, that is not enough to be "engaged in the business" of *audio-visual* materials under the VPPA.

Perhaps recognizing that "engaged in the business" dooms their claim, Plaintiffs pivot to a position that would require that phrase be struck: that a defendant is a VTSP so long as its "organized functions include distributing video." Opp. PageID.145. It is hard to imagine who today would *not* be a VTSP in Plaintiffs' reading. *See Paramount*, 133 F.4th at 649–50; *Pileggi*, 2025 WL 2319550, at *14 (Randolph, J., concurring) (urging courts to "avoid the parade of horribles" that would result if the Act were read to "sweep in all websites"). This Court should reject Plaintiffs' invitation to "broaden the statute beyond what the statutory structure and purpose can support." *Pileggi*, 2025 WL 2319550, at *11. Indeed, "the stringency" of the Act's punitive remedies "weighs against judicial expansion of the text to cover harms *further removed from commerce in videos or similar audio-visual services.*" *Id.* at *9 (emphasis added).

**2.** Even if the College's free online library were a "business," the College is not a VTSP because the library is not the focus of its work. Courts have "recognized consistently that delivering video content must be central to the defendant's business or product for the VPPA to apply," and that the VPPA does not apply where video content is ancillary to the defendant's true purposes. Opening.Br. PageID.62–64 (quotation omitted) (collecting cases). Here Plaintiffs claim that "the videos are aimed toward the sale of Defendant's products"—bookstore merchandise and distance-learning programs (Compl. PageID.12)—and "are a marketing tool to promote

Defendant's" reputation by soliciting donations—"nothing more." *Hernandez v. Container Store, Inc.*, 2024 WL 72657, at *2 (C.D. Cal. Jan. 3). So under "Plaintiffs' characterization, the websites are maintained for the brands"; "they are not Defendant's particular field of endeavor." *Carroll v. General Mills, Inc.*, 2023 WL 4361093, at *4 (C.D. Cal. June 26).

Citing mostly VPPA cases against media companies, Plaintiffs respond that the *General Mills* line of cases does not govern businesses "for whom the videos are the product," PageID.148 (quotation omitted), but the College is plainly not such an enterprise. In Plaintiffs' other cases, the audiovisual material was inseparable from the defendant's primary business (e.g., streaming software in Smart TVs and video tours in an online real estate marketplace). None supports treating a recently created online library as the principal "product" of a traditional, 180-year-old college with a physical campus.

Still, Plaintiffs insist that the College's free online library is its focus because online visitors exceed "current undergraduate enrollment" and because the College solicits donations via the online-course website. PageID.146–47. But the comparison is absurd: a free website obviously reaches more people than can enroll at a private in-person college. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (courts should draw upon "common sense"). No matter how many people access the website, in-person teaching—as part of a real, accredited post-secondary program—is obviously the College's mission. *Id.* at 682 (crediting "obvious alternative explanation" for alleged fact). The College employs roughly 700 people, only a small fraction of whom work on

online courses; the rest are dedicated to extensive on-campus activities.[1] "Donate," meanwhile, is merely one of several links in the online-library website header, and it appears in the same place throughout the College's webpages, including on www.hillsdale.edu.

## B. Plaintiffs Are Not "Subscriber[s]" Because They Did Not Pay For Access and Lack a Durable Relationship with the College

**1.** Contemporary definitions of "subscriber" *all* require the exchange of money or its equivalent. Opening.Br. PageID.65–66 (quoting *Peterson v. Learfield Commc'ns*, 705 F. Supp. 3d 937, 956 (D. Neb. 2023) (gathering definitions)). More, the "context and…overall statutory scheme" confirm this reading. *Paramount*, 133 F.4th at 650. *See* Opening.Br. PageID.67; *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 573–76 (1995) (holding that "communication" in Securities Act is limited to "public" communications because word appears in list with other public communications). Plaintiffs admit they paid nothing to access the College's online library, Compl. PageID.12, so they cannot be "subscribers."

Plaintiffs respond that "nowhere in the statute does it say that to be a subscriber, one must make payments." PageID.150. But "subscriber," as understood at the time of the statute's enactment, contemplates payment, and context reinforces this interpretation. *See Peterson*, 705 F. Supp. 3d at 958. For the same reason, Plaintiffs' contention that Congress could have added "paid" before "subscriber," PageID.151, is also inapt, because "paid subscriber" would have been redundant, as would have "paid

---

[1] https://careers.hillsdale.edu/about-us. *See* PageID.47 n.1 (courts consider material incorporated into Complaint).

purchaser" or "paid renter." Plaintiffs' burden is to show Congress meant to *deviate* from ordinary meaning. *See Feliciano v. Dep't of Transp.*, 145 S. Ct. 1284, 1291 (2025). And they cannot carry it.

Plaintiffs cite contrary, nonbinding opinions from other circuits (while ignoring the College's principal case), but those decisions are poorly reasoned. The First Circuit's *Yershov* decision wrongly looked to *modern* definitions of "subscribe" instead of contemporaneous ones, and misapplied the surplusage canon. *See* Opening.Br. PageID.67–68 (each term carries unique meaning). The Second Circuit in *Salazar v. NBA*—a decision the Sixth Circuit explicitly declined to follow, *Paramount*, 133 F.4th at 651—made the same errors. *See* 118 F.4th at 552 (referring to "subscrib[ing] to a YouTube channel"). Finally, the Eleventh Circuit in *Ellis* thought the absence of "paid" before "subscriber" dispositive, 803 F.3d at 1256, but "no modifier" is necessary when a term "itself normally" connotes the relevant characteristic. *Johnson v. United States*, 559 U.S. 133, 142 (2010). In 1988, "subscriber" connoted payment, just as it did in the 1984 Cable Communications Policy Act, which used "subscriber" to refer to cable companies' paying customers. *See* 47 U.S.C. § 551(c)(1). If Congress wanted to reach non-paying individuals, it would have used a term such as "viewer," "visitor," or even "person."

**2.** Even putting aside *Peterson*'s monetary-consideration view, numerous courts read "subscriber" to require a deliberate, durable, ongoing affiliation with a provider—not casual, consequence-free viewing. Opening.Br. PageID.71 (collecting cases). Plaintiffs' allegations—opening free accounts to access free course material

with the unfettered option never to return—describe users or patrons, not subscribers. *See Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015); *Nolen v. PeopleConnect, Inc.*, 2023 WL 9423286, at *2 (N.D. Cal. Dec. 14); *see also* Opening.Br. PageID.72–73 (discussing legislative history).

Plaintiffs do not respond to the argument that they do not plausibly allege a "deliberate and durable affiliation" with the provider. Opening.Br. PageID.71–73. Indeed, Plaintiffs address *none* of the three decisions the College cites for this proposition, so they concede the argument, as is "well settled in this District." *Fed. Nat'l Mortg. Ass'n v. River Houze, LLC*, 596 F. Supp. 3d 925, 932 (E.D. Mich. 2022).

Plaintiffs instead revert to the First, Second, and Eleventh Circuit decisions already discussed, which supposedly show that they "provided sufficient consideration" to the College "to be subscribers." Opp. PageID.152–154. In truth, their holdings are far narrower than Plaintiffs let on. The First Circuit explicitly limited *Yershov* to the specific factual "transaction described in the complaint"— which involved GPS location data and device identifier information not alleged here. 820 F.3d at 489. The same goes for the discredited *Salazar v. NBA*, whose plaintiff provided far more than Plaintiffs here, including, "(1) his email address, (2) his IP address, and (3) cookies associated with his device." 118 F.4th at 552 (adding that defendant could "identify" residence and "physical location"). The Second Circuit also emphasized that its "ruling is narrow." *Id.* at 553.

*Ellis* cuts against Plaintiffs. The court "found *no* subscriber relationship" between Cartoon Network and the user of its mobile application. Opp. PageID.153 (emphasis

added). In Plaintiffs' false retelling, that is because the user in *Ellis* provided the defendant with "no information." *Id.* In truth, the user gave the company his valuable "mobile device identification or Android ID," and the real reason no "consumer" relationship existed was that "no ongoing commitment or relationship [existed] between the user and the [company]." *Ellis*, 803 F.3d at 1254, 1257. The plaintiff remained "free to delete the app without consequences whenever he like[d], and never access its content again." *Id.* at 1257. Just so here: Plaintiffs can choose never to "visit the…website ever again," and "[would] have zero consequences, costs, or further obligations." *Austin-Spearman*, 98 F. Supp. 3d at 669. Such "casual consumption" is not a "subscription." *Id.*

### C. As the Second Circuit Held in *Solomon* on Identical Facts, Meta Pixel Does Not Transmit "Personally Identifiable Information"

Courts applying the "ordinary person" test have held that code transmitted by Meta Pixel, such as a jumbled version of a website URL or a Facebook ID ("FID"), is not PII. *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 54–55 (2d Cir. 2025). The allegations here mirror those in *Solomon*, which explains that the muddle of characters in Meta Pixel's transmission makes it implausible that anyone would identify even a particular webpage—let alone information indicating that a person watched a particular video—and the FID appears merely as an unlabeled sequence of numbers buried in code. *Id.* Even if one could identify an FID, courts have consistently held that static identifiers (IP addresses, cookie codes, or device serial numbers) are not PII, even when recipients could link them to individuals. *See* Opening.Br. PageID.29 (collecting cases). An FID can be linked to someone, but only

if the user is simultaneously logged into Facebook in the same browser and publicly displays her real name there—conditions not always present. Compl. PageID.9, 15–16.

Plaintiffs do not dispute that *Solomon* is directly on point, and, if followed, forecloses their claim. *Fed. Nat'l Mortg. Ass'n*, 596 F. Supp. 3d at 932 (failure to respond is waiver). Instead, they misleadingly suggest the Sixth Circuit in *Paramount* already decided the issue, rejecting the "ordinary person" standard adopted by the majority of federal circuit courts, including *Solomon*. PageID.156–57. That is wrong. To start, the *Paramount* court was interpreting "subscriber," not PII, and on that point it decided to "break with" the Second and Seventh Circuits by adopting a *narrower* definition of subscriber. 133 F.4th at 651. Plaintiffs insinuate that the Sixth Circuit adopted a *broader* interpretation of the VPPA, but it did the *opposite*. In criticizing the other courts' overly broad definitions, the Sixth Circuit pointed out that they were wrong to rely on PII as the limiting principle protecting the "general store owner who…disclos[es] particular customers' bread-buying habits" from VPPA liability because it would be nonsensical to "put such a pivotal limitation in a nonexclusive definition." *Id.* at 652. But, in making this point, the court did not so much as hint whether the "ordinary person" or "reasonable foreseeability" standard controls.

In the face of the overwhelming consensus of circuits favoring the ordinary-person standard, Plaintiffs invoke two district court cases: *Manza v. Pesi, Inc.*, 2025 WL 1445762, and *Haines v. Cengage Learning, Inc.*, 2025 WL 2045644 (S.D. Ohio July

22). Neither is convincing. *Manza* simply restates *Yershov*'s reasoning, 2025 WL 1445762, at *8, which the majority position rejects because it focuses on the wrong party and fosters unpredictability. *See* Opening.Br. PageID.74. *Manza* reads *Solomon* to open a "loophole" in the VPPA, 2025 WL 1445762, at *8, but the VPPA was never meant to be a comprehensive internet-privacy law, and it is entirely unsurprising that cutting-edge internet marketing technology is not prohibited by a statute passed before most people even had computers. *Pileggi*, 2025 WL 2319550, at *14 (Randolph, J., concurring) ("Congress's failure to foresee technological change…is not a reason to extend the statute by judicial fiat."). Contrary to *Manza*'s conclusion that "Congress intended the meaning of PII to be expansive so that it could adapt to changing technology," 2025 WL 1445762, at *6, the punitive nature of the statute requires the opposite: the "statutory text [must] be construed against…expansive liability." *Pileggi*, 2025 WL 2319550, at *9.

*Haines*, for its part, did not address the defendant's *Solomon*-derived arguments head-on because the district court found the defendant's objections to the magistrate judge's report and recommendation "not well-taken." 2025 WL 2045644, at *3. *Haines* also mischaracterizes the Sixth Circuit in *Paramount* as having authorized an expansive reading of PII. *Id.* As explained above, *Paramount* does not opine on the meaning of PII or address the two standards. 133 F.4th at 652. *Haines* further derides *Solomon* as contrary to "the vast majority" of federal courts, 2025 WL 2045644, at *2–

3, but nearly all those district court cases pre-date *Solomon*. And the circuit courts, specifically in *Solomon* and now *Pileggi*, have moved the law in a different direction.[2]

Plaintiffs' final PII argument is that they "alleged that their FID and the exact title of the video they watched…was disclosed to Meta," PageID.158, but that is false twice over. To start, Plaintiffs allege their browsers transferred to Meta only jumbled computer code, not a video title, and the FID was buried, unmarked, in that jumbled code. *See* Opening.Br. PageID.54–55, 75. Additionally, when Plaintiffs try to explain how they deduced a video title from the jumbled code, they show that Meta *never received a video title or watch history*, but instead received only a URL for a course welcome page. Plaintiffs include screenshots of Pixel transmissions they allege show that a user "requested or viewed the video entitled 'Totalitarian Novels.'" Compl. PageID.15. But their screenshot comes from the front page for an online course titled "Totalitarian Novels," not a page playing a particular lecture video, as shown in the complete screenshot below of the webpage Plaintiffs rely on:[3]

---

[2] Plaintiffs also claim *Eichenberger v. ESPN, Inc.* recognized that a Facebook link or email address "may" allow an ordinary person to identify an individual, PageID.157–58 n.10, but the Ninth Circuit specifically declined to "opine on the merit of [that] theor[y]." 876 F.3d 979, 986 (9th Cir. 2017).

[3] *Compare* https://online.hillsdale.edu/courses/promo/totalitarian-novels, *with* PageID.15; *see also* PageID.47 n.1.

HILLSDALE COLLEGE

Politics

# Totalitarian Novels

8 LESSONS    4.5h TOTAL LENGTH

**Enroll**

▶ Watch Trailer

Totalitarian novels depict regimes that exert complete and pervasive control over the lives of their subjects. George Orwell, Aldous Huxley, Arthur Koestler, and C.S. Lewis imagine the terrible possibilities of unchecked modern tyranny. Join Larry P. Arnn, president of Hillsdale College, and Hillsdale College students in this exploration of *1984*, *Brave New World*, *Darkness at Noon*, and *That Hideous Strength*.

The course includes four lectures and four conversations, each about 30 minutes long. It is structured with one...

⌄ Expand Course Details

GENEROUS SPONSORSHIP PROVIDED BY

the Herbert H. and Barbara C. Dow Foundation

## Lessons in this course

LESSON 1
**1984: Pain**
In George Orwell's *1984*, the regime is dedicated to power. The Party ensures that its members obey through pain and torture, as shown when O'Brien tortures Winston.

LESSON 2
**1984: History and Language**
Orwell explores the possibility of a regime influencing human nature by controlling history and reforming language to limit the range of ideas its subjects can contemplate. Although the novel does not provide hope to the characters, the reader is inspired to courageous resistance against such a regime.

LESSON 3
**Brave New World: Pleasure**
The regime in Aldous Huxley's *Brave New World* is dedicated to ease. The world state is maintained by attempting to fulfill all sensual human desires, thereby precluding any aspiration to nobility or virtue. John the Savage rebels against the banality of the society into which Mustapha Mond and Bernard Marx have dragged him.

LESSON 4
**Brave New World: Drugs and Genetics**
Huxley describes a world in which science has provided the ability to engineer children in test tubes to suit them to specific castes. The ubiquitous drug Soma suppresses ambition and aggression by providing euphoria without any side effects.

LESSON 5
**Darkness at Noon: Regret**
Arthur Koestler's *Darkness at Noon* fictionalizes the experience of an old Bolshevik revolutionary after Stalin's rise to power. Through his arrest and interrogations, Rubashov regrets the deaths on his hands and his role in creating a new generation of cruel Bolsheviks who are dedicated to the leadership of the party rather than the ideals of the revolution.

LESSON 6
**Darkness at Noon: Loyalty and Confession**
Despite his regrets, Rubashov has corrupted himself to the point that he eventually doubts his righteousness, willingly confesses to his sham crimes, and accepts punishment from the Party.

LESSON 7
**That Hideous Strength: Faith**
C.S. Lewis's *That Hideous Strength* depicts the infancy of a totalitarian regime. Tyranny is averted through divine intervention manifested through the friendship, education, and faith of a small company led by Fisher-King.

LESSON 8
**That Hideous Strength: Science and Bureaucracy**
Lewis exposes the dangers of substituting scientific expertise for wisdom and bureaucracy for politics as the ruling impulses of a nation. Mark and Jane Studdock discover the importance of marriage, family, friendship, and faith.

- 13 -



Even if an "ordinary person" could decipher a webpage URL from the jumbled code sent by Meta Pixel (they could not), this URL explains nothing about what the user did other than open the webpage, and it certainly provides no information about

whether the user watched or tried to watch any specific video (or the course trailer at the bottom of the page) rather than merely browsing the course material.

More, a user *cannot even access* the lecture videos on this page; they are located on *different* webpages, and even then, one can visit those pages and review other course material without watching or trying to watch *any* videos.[4] Plaintiffs have thus failed to allege their browsers sent any watch history information, and without watch history, there is no PII. Opening.Br. PageID.49. This is a perfect example of *Solomon*'s holding that Meta Pixel's transmissions are so confusing that no ordinary person would conclude they contain PII.

In fact, Plaintiffs seem to have alleged here that Meta Pixel in fact *did not* send PII at all, but sent only webpage information. All Plaintiffs allege is that Meta learned that they opened the *front page* of an online course containing a list of available videos, PageID.15, which does not reveal they watched or tried to watch anything. That is not PII; "looking through a list of available episodes of a show—is less like renting or buying a video at a brick-and-mortar store, and more like browsing through a particular aisle of said store." *Shapiro v. Peacock TV*, 2025 WL 968519, at *9 (S.D.N.Y. Mar. 31). Without PII, Plaintiffs' claim fails.

### D. The College Did Not "Disclose" Any Information to Meta—Plaintiffs Did

The College cannot be liable for disclosing PII because it never even possessed Plaintiffs' FIDs, so it could not disclose them to Meta. *See Atl. Diving Supply, Inc. v.*

---

[4]  *E.g.*,  https://online.hillsdale.edu/courses/totalitarian-novels/lessons/1984-pain;  *see  also* PageID.47 n.1.

*Basnight*, 2022 WL 5568083, at *13 (E.D. Va. Sept. 21) ("[A]s a matter of both law and common sense, [Defendant] cannot disclose…information that he does not possess."); *Chutich v. Green Tree Acceptance, Inc.*, 1993 WL 173813, at *9 (D. Minn. 1993) ("a corporation cannot disclose what it does not know."); *Eichenberger*, 876 F.3d at 986 ("As Plaintiff concedes, [the shared data] *cannot* identify an individual unless it is combined with other data [the defendant] apparently never even possessed."). Plaintiffs allege only that the Meta Pixel causes Plaintiffs' FIDs to be sent *directly from their computers* to Meta, *without the College's access or possession*. Compl. PageID.8. Courts facing like allegations have recognized that this means the defendant website does not disclose the PII—plaintiffs themselves do. *See Buechler v. Gannett Co., Inc.*, 2023 WL 6389447, at *4 (D. Del. Oct. 2) (dismissing Pixel-based VPPA claim because allegations "appear to establish that the [actions of the] subscriber-users themselves and/or Facebook"—not defendant—"result in the disclosure of Plaintiffs' PII").

Plaintiffs attempt to backpedal, asserting even if they were the ones that disclosed, the disclosure is "attributable" to the College because the Meta Pixel on the College's website "caused" Plaintiffs to disclose the information. Opp. PageID.158. In other words, *Plaintiffs concede the College did not disclose their information*; just that the College is one link in the causal chain that *allowed Plaintiffs* to disclose their information (as are Plaintiffs, who created Facebook accounts, allegedly used real names for them, and accessed the College's free online library in the same browser

while logged into Facebook). Compl. PageID.19–20. But the College could not disclose what it never had. *Atl. Diving Supply, Inc.*, 2022 WL 5568083, at *13.

Plaintiffs cite two Meta Pixel VPPA cases where a district court concluded the defendant disclosed information to Meta, but they involved different (factually incorrect) allegations premised on a false understanding of how the Pixel works. *See Czarionka v. Epoch Times Ass'n, Inc.*, 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17) ("Plaintiff alleges…that Defendant itself discloses subscriber information [through] the Pixel on its website"); *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 158 (S.D.N.Y. 2023) (plaintiff alleged "the website sends to Facebook…'the video content name'" and user's FID).

The Pixel's functionality is hardly a technicality. Meta has a direct relationship with its users, who disclose their information directly to Meta. Compl. PageID.8. Meta uses Pixel to track Meta users' activities by installing its own cookies (with the FID) on their devices, and then the users' devices directly transmit browsing information to Meta. Compl. PageID.6–8. None of this happens without a user first opening a Facebook account (among other things). *Id.* And while Plaintiffs protest they did not "consent" or have "notice" about these consequences when they created accounts, PageID.159, that is irrelevant (and untrue). The point is that the College was not involved—at all. Whether or not Plaintiffs consented to *Meta's* web browsing tracking, the *College* made no disclosure.

**II.     EVEN IF THE COLLEGE DISCLOSED CONSUMER INFORMATION, IT WAS IN "THE ORDINARY COURSE OF BUSINESS" AND PERMITTED BY 18 U.S.C. § 2710(B)(2)**

The VPPA specifically allows disclosures to third parties that facilitate a VTSP's own marketing efforts. 18 U.S.C. § 2710(b)(2)(E). *See Daniel*, 375 F.3d at 382*; Rodriguez v. Sony Comput. Ent. Am., LLC,* 801 F.3d 1045, 1054 (9th Cir. 2015).

Plaintiffs are incorrect that *Daniel*'s analysis is dicta and involved incompatible facts. Opp. PageID.161. *Daniel* analyzed whether the (b)(2)(E) exception covered the disclosures at issue to assess whether the defendants were VTSPs (§ 2710(a)(4) incorporates § 2710(b)(2)(E)), and it specifically held that the exception did not apply because the disclosure was not the "result of any of these activities," and "these activities" included "marketing," explained in the prior sentence. 375 F.3d at 382. "Pivotal to its decision," this point is a "holding." *Freed v. Thomas*, 976 F.3d 729, 738 (6th Cir. 2020). That the disclosures, related to a prior sex-crime investigation, were not marketing activities does not diminish the Court's holding that marketing activities trigger the exemption. *Daniel* therefore controls, rendering irrelevant Plaintiffs' district-court cases.

Finally, Plaintiffs argue that even if the College could invoke the exception, it would not excuse the College because it gave Meta information about existing customers, thus not fulfilling a "marketing" purpose, and because the College knew Meta would share that data with others. Opp. PageID.162. These arguments fail, too. Marketing almost always targets both new and existing users, and the whole point of integrating the ordinary-course-of-business exception into the definition of VTSP is that third-party marketing entities who receive PII become regulated as VTSPs and

so may be held liable *directly* for any improper disclosure. So if Meta later misused Plaintiffs' data, Meta is answerable. The College is not.

## III. THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE BECAUSE AMENDMENT WOULD BE FUTILE

Plaintiffs half-heartedly ask for a chance to "include the allegations necessary to assert a claim under the VPPA." PageID.162–63. But the claim cannot be fixed. Plaintiffs cannot allege facts that would make (1) the College's free library a VTSP; (2) them subscribers; (3) the Pixel transmit PII; (4) the College have disclosed Plaintiffs' FIDs; or (5) disclosures not permissible in the ordinary course of business.

## CONCLUSION

This Court should dismiss Plaintiffs' Complaint with prejudice.

Dated: 08/29/2025

Respectfully submitted,

/s/ Collin J. Vierra

COLLIN J. VIERRA
EIMER STAHL LLP
1999 S. Bascom Ave. Ste. 1025
Campbell, CA 95008
(408) 889-1668
(312) 692-1718 (fax)
cvierra@eimerstahl.com

RYAN J. WALSH
EIMER STAHL LLP
10 E. Doty St. Ste. 621
Madison, WI 53703
(608) 620-8345
(312) 692-1718 (fax)
rwalsh@eimerstahl.com

*Counsel for Defendant Hillsdale College*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed a true and correct copy of the foregoing with the Clerk of Court via the CM/ECF system.

All participants in this case are registered CM/ECF users and will be served by CM/ECF notification.

Dated: 08/29/2025                    /s/ Collin J. Vierra
                                     COLLIN J. VIERRA